## NEW YORK & PORTO RICO S. S. CO. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit. December 10, 1928.

No. 56.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles Burlingham and William J. Dean, both of New York City, of counsel), for plaintiff.

Charles H. Tuttle, U. S. Atty., of New York City (Edgar G. Wandless and H. F. Birnbaum, Sp. Asst. U. S. Atty., both of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The suit is on a requisition charter, whereby the defendant agreed to reimburse the plaintiff, as owner of the steamship Brazos, for "any proper increases in wages and bonuses over the standard prevailing August 1, 1917, for master, officers and crew."

On October 12, 1917, the defendant requisitioned the use of the Brazos, and thereafter employed the plaintiff to operate her under a requisition time charter, adopted by the Shipping Board, whereby the defendant agreed to pay the plaintiff charter hire "at the monthly rate which shall from time to time be established by the United States Shipping Board for a vessel of her description," and to reimburse the plaintiff for certain extra expenses and increases in wages during the requisition service. The steamer's freights during the service went to the defendant. The requisition order of October 12, 1917, provided: "Owners whose steamers are operating in their regular trades are to continue the operation of their steamers for account of the government, as they have been doing for themselves, until they receive further instructions."

On August 1, 1917, and until termination of the requisition service, which began October 15, 1917, and ended January 28, 1919, the plaintiff operated the Brazos exclusively in the Atlantic coastwise and West Indian trade, and until May 4, 1918, paid her master, officers, and crew wages and bonuses in conformity with the scale prevailing therein August 1, 1917. The Shipping Board established a new wage scale on May 4, 1918, which raised the plaintiff's August 1, 1917, scale, and caused the payment by plaintiff of increases in the sum of $7,237.51, which is its claim and the amount of the judgment.

The new scale did not exceed the August 1, 1917, transatlantic standard, which the plaintiff maintains should not be taken, but rather the standard of the steamer's trade. The government contends that the standard to be taken is the standard in transatlantic trade.

The plaintiff's claim is based on the following provision of the time charter:

"Tenth. In addition to the aforesaid compensation for use of the steamship, the United States agrees to reimburse the owner for any proper increases in wages and bonuses over the standard prevailing August 1, 1917, for master, officers, and crew, the owner to produce satisfactory evidence of such increases in wages or bonuses."

Judge Thacher, who tried the case in the District Court, held the "standard" to be that prevailing in the Atlantic coastwise and West Indian trade on August 1, 1917.

It is argued for the government that a uniform standard for payment of increased wages was intended, irrespective of the particular service in which the vessel might be engaged, and that the standard was the wage scale in the transatlantic trade on August 1, 1917. This is said to be strengthened by the provisions of the second article of the charter, fixing the full complement of the crew upon the basis required in the transatlantic service; likewise by the provisions of the eighth article that "dead weight tonnage shall be based on summer freeboard assigned or to be assigned with reference to North Atlantic service, according to the standards of any recognized classification society," such dead weight tonnage, the number of passenger accommodations, and speed being the factors determining the rate of hire.

It is difficult to see why an agreement which contemplated the operation of steamers in various trades, and which by the very terms of the requisition order kept them in their regular trades until they received further instructions, should be regarded as fix-

ing the transatlantic wage scale of August 1, 1917, as the basis upon which all increases of which they were' to receive the benefit were to be computed, merely because the time charter required them to carry the minimum crew employed in the transatlantic service and to compute dead weight tonnage as in the transatlantic trade. Nothing is said in the tenth article, which regulates reimbursement for increases in wages, about the transatlantic trade and, the ordinary rule of "expressio unius exclusio alterius" alone affords a substantial ground for rejecting the government's interpretation.

The government offered to prove at the trial that the hire established by the Shipping Board "was fixed upon the standard wage scale plus a 50 per cent. bonus, which went to transatlantic steamers," which bonus was a part of the prevailing wage on August 1, 1917. But this offer had no relation to the basis for reimbursement of increases in wages and bonuses, which were dealt with separately and clearly in the charter. The proof would have clarified nothing and was properly excluded.

Moreover, the whole argument based on the equity of a uniform standard will not bear scrutiny; for, if such a standard be assumed, there would still be an initial inequality between ships paying the standard scale and those paying above and below it. Upon a general wage increase, with a transatlantic wage scale, the argument is that the ships originally paying less than the standard would have to absorb the increase until the wages reached the standard adopted in establishing their hire. Yet it is quite as reasonable to suppose that the inequality was to continue after the wage increase. If, in spite of the clear provisions of the tenth article of the charter, it had been intended to correct the inequality after a wage increase, appropriate language would have been used to show such an intent. Moreover the initial inequality would have been corrected adequately, and the correction would not have been the chance and partial correction that is contended for.

Judge Thacher said in his opinion:

"If the ship had been requisitioned for one trade and used in another, uncertainty might arise as to whether the agreed standard was that which prevailed in the trade for which the ship was requisitioned or that which prevailed in the trade in which she was operated under the charter."

Although the Brazos was at all times engaged in the Atlantic coastwise and West India trade, these words of the judge were seized upon by counsel for the government as throwing doubt on his entire conclusion. But we can see no inconsistency between the method of computing increases of wages in the present case and that which should be adopted where there was a change of service, either upon or after requisition. In any circumstances we think the increase must be measured from the base of the new service into which the vessel has entered. Of course, a change of service from one where wages are low to one where wages are high would be a loss to the ship; but it would not be an increase in wages, within the meaning of article tenth, but an inevitable claim, due to no alteration of the wage scale, but to the power of the Shipping Board to order a change. The ship must bear such an increase, and if wages are raised in that service above its wage scale of August 1, 1917, she can recoup only the difference between the new scale and that obtaining on August 1, 1917, in the service she has entered. The question, in our opinion, is always one of the service when the increase occurs. As the District Judge truly said:

"The interpretation contended for in behalf of the defendant finds no support in the language of the agreement, and robs the words 'reimbursed' and 'increases' of all meaning by the adoption of an arbitrary standard which had no relation to the operation of the ship before or after requisition. * * *"

There remains for consideration the question whether interest should have been allowed on increased wages prior to the rendering of judgment. "The rule is that, in the absence of a stipulation to pay interest or a statute allowing it, none can be recovered against the United States upon unpaid accounts or claims." Seaboard Air Line R. Co. v. United States, 261 U. S. at page 304, 43 S. Ct. 354, 355 (67 L. Ed. 664). See, also, Boston Sand & Gravel Co. v. United States, 49 S. Ct. 52, 73 L. Ed. —— decided by the Supreme Court November 19, 1928.

Section 177 of the Judicial Code as amended (28 USCA 284) provides that:

"No interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, except that interest may be allowed in any judgment of any court rendered against the United States for any internal revenue tax erroneously or illegally assessed or collected, or for any penalty

collected without authority or any sum which was excessive or in any manner wrongfully collected, under the internal revenue laws."

The foregoing section would seem to preclude allowance of interest before judgment, if this action had been brought in the Court of Claims. In Baxter v. United States, 51 F. 671, the Circuit Court of Appeals of the Eighth Circuit disallowed interest in a suit under the Tucker Act (24 Stat. 505) and said:

"When it is considered that the act of Congress which permits the maintenance of this suit against the United States gave original jurisdiction thereof to the Court of Claims, and concurrent jurisdiction to the court below, section 1091 of the Revised Statutes, in effect, prohibits the allowance of any interest upon such a claim as plaintiff's until it is reduced to judgment."

The Supreme Court because of the general rule, and particularly because of section 284, title 28 of the United States Code, refused to allow interest in a suit brought under the Tucker Act which originated in the Court of Claims upon the value of land which had been taken by the government under the war power. United States v. North American Co., 253 U. S. 330, 40 S. Ct. 518, 64 L. Ed. 935. But, in a proceeding brought under 25 Stat. 357 (40 USCA §§ 257, 258), to condemn lands, interest was allowed against the government because the act conformed the procedure to that in the state courts where interest is added from the date of the taking. United States v. Rogers, 255 U. S. 163, 41 S. Ct. 281, 65 L. Ed. 566. On the other hand, in Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 43 S. Ct. 354, 67 L. Ed. 664, where section 10 of the Lever Act (40 Stat. 279) was involved, the Supreme Court allowed interest against the government as "just compensation" for taking certain land, though the land was not acquired in condemnation proceedings. "Just compensation" was said to require interest, in order that the railway might receive the full equivalent of a value "paid contemporaneously with the taking." In the same way interest was allowed in a suit under the War Risk Insurance Act, though the statute did not mention the payment of interest (Standard Oil Co. v. United States, 267 U. S. 76, 45 S. Ct. 211, 69 L. Ed. 519), on the ground that:

"When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business."

Thus interest is allowed under the condemnation statute, the Lever Act, and the War Risk Insurance Act, because of special considerations. But an ordinary claim like the present for breach of a government contract would not bear interest, if sued on in the Court of Claims. Congress granted concurrent jurisdiction to the District Court, and this by implication was accompanied by the same inhibition as to interest before judgment that applied to the Court of Claims. How strict the rulings of the Supreme Court are as to allowance of interest against the government is seen from the last decision on the subject in Boston Sand & Gravel Co. v. United States, supra.

Moreover, clause fourteenth of the time charter provided that, in the "case of loss or damage due to the operation of a risk assumed by the United States, just compensation for such loss or damage, with interest at 6 per cent. per annum, commencing thirty days after proof of such loss or damage shall be paid by the United States. * * *" And in New York & Porto Rico S. S. Co. v. United States, 58 Ct. Cl. 652, the Court of Claims necessarily allowed interest on the value of the Carolina, a requisitioned vessel, operated under a time charter like the present, which had been sunk by a German submarine.

But the above fourteenth clause, relating to war risks assumed by the government, does not apply to ordinary breaches of the contract. The plaintiff specifically accepted the "requisition charter in full satisfaction of any and all claims * * * against the United States arising out of the requisition and * * * the compensation * * * provided for as the just compensation required by law." It is thus manifest that interest was provided for where intended to be paid. Neither by virtue of any special stipulation, nor as "just compensation" under the theory of Seaboard Air Line R. Co. v. United States, supra, can it be allowed on the present claim.

Judgment affirmed.