**NATIONAL BULK CARRIERS, Inc. v. UNITED STATES (two cases). THE VIRGINIA.**

Nos. 9573, 9574.

Circuit Court of Appeals Third Circuit.

Argued May 21, 1948.
Decided Aug. 23, 1948.

944

J. Frank Staley, of Washington, D. C., (H. Graham Morison, Asst. Atty. Gen., Jess H. Rosenberg, Atty. Dept. of Justice, of Washington, D. C., and William Marvel, U. S. Atty., of Wilmington, Del., on the brief), for the United States.

Leonard J. Matteson, of New York City, (Abel Klaw, of Wilmington, Del., Bigham, Englar, Jones & Houston, of New York City, Joseph W. Henderson, of Philadelphia, Pa., and Julian S. Gravely, Jr. and Samuel D. Antopol, both of New York City, on the brief), for National Bulk Carriers.

Before BIGGS, McLAUGHLIN, and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This appeal concerns the valuation of the steam tanker Virginia, known to have been torpedoed by enemy action, May 12, 1942. There are two subsidiary questions arising out of the interest allowed on the main sum; one of these is brought up by libellant's cross appeal, the other is in the main case.

At the time of the loss, the vessel was insured through the War Shipping Administration by the government in connection with its requisition time charter of the ship. The suit under Section 225 of the Merchant Marine Act of 1936 as amended [1] is to have determined, in accordance with the warrant of the insurance, "just compensation" for the Virginia as provided for in Section 902 of said act.[2]

It is to be noted that the government objected to the jurisdiction of the District Court in the matter, contending it was for the Court of Claims. We upheld the District Court jurisdiction in United States v. Leahy, 148 F.2d 462. The government specifically saves the question.

The government while conceding that "market value is the permissible test [for "just compensation"] where the boat has a ready market," denies that such market existed. It further asserts that what was presented as sales of comparable ships by libellant were not in reality sales which would constitute a market or establish a market value. It then urges that the construction costs of the Virginia and of her six sister ships should be the measure of the just compensation for the loss under the facts of this case. Appellee, insisting that market value is the test, says that as the best evidence of such value it presented proper proof of sales of comparable ships. The case was referred to a Special Commissioner who in an exhaustive report upheld the libellant. At the hearing on exceptions to the Commissioner's report, the

government represented that it had new evidence affecting the final prices of the ships the sales of which had been relied on by libellant. The Court thereupon re-referred the suit to the Commissioner. There was a further hearing, after which the Commissioner filed a supplemental report which concluded that "the first report should not be modified in any way by reason of the evidence offered at the re-hearing." The District Court after consideration of the reports, "respondent's objections thereto and the briefs and arguments of the proctors" adopted the reports as proper and valid with the exception of the interest allowed by the Commissioner. In all other respects the reports, findings, and conclusions of the Commissioner were confirmed.

The Supreme Court has long since settled the principles by which compensation for the loss of the Virginia must be decided. In one of the leading cases, United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55, Mr. Justice Roberts said, "* * * value is to be ascertained as of the date of taking. * * * Where, for any reason, property has no market resort must be had to other data to ascertain its value; * * *." In the case of the total loss of a vessel, as here, the Supreme Court in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890, said that "the measure of damages is its market value, if it has a market value, at the time of destruction. * * * Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the colli-

---

[1] Section 225 Merchant Marine Act, June 29, 1936, c. 858, Title II as added June 29, 1940, c. 447, 54 Stat. 690, and as amended April 11, 1942, c. 240, 56 Stat. 215, March 24, 1943, c. 26, 57 Stat. 50, 46 U.S.C.A. § 1128d.

[2] Subsection (a) of Section 902, 46 U. S.C.A. § 1242, reads in part: "When

any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use."

sion; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. * * * And by numerous decisions of this court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value." And in Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 474, 68 L.Ed. 934, which involved compensation for a partially completed ship requisitioned by the government, the Court said, "The value of property may be greater or less than its cost; and this is true of contract rights and other intangibles as well as of physical things. It is the property and not the cost of it that is protected by the Fifth Amendment."

The Rules for Determination of Just Compensation promulgated by the Advisory Board to the War Shipping Administration follow the above outlined principles.[3] Rule 1 provides: "Just compensation for vessels requisitioned for title or for use is to be determined on the basis of value as of the date of taking, * * *. Value means value on the American market, not on foreign markets."

And Rule 3 states that: "Where market value cannot be determined by sufficient sales, or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment as to value can be based. These various matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

The sales so vigorously objected to by the government were by the Maritime Commission of T2-SE-A1 and T3-S-A1 type tankers in 1942 and 1943 to a number of private purchasers. Fourteen of the T2 ships were sold in 1942 to at least six different buyers including competitors of libellant. There were nine of this kind sold in 1943 by June 21st of that year to three oil companies. In the last half of 1943 an additional nine were sold to three purchasers. Seven of the T3s were sold in 1943 to two oil companies. Because the testimony for the libellant largely centered on the T2 type, sales of which far exceeded those of T3s, the Commissioner ignored the T3 type in determining the Virginia's market value. The Commissioner found that the spread of T2 sales over 1942 and 1943 made no material difference "since conditions were comparable throughout the entire period." This does not seem to be disputed.

The average price obtained by the Maritime Commission for the T2s was three million dollars. Arthur A. Fisher, a witness for the government, was the Maritime Commission examiner who handled most of its tanker transactions. These amounted to 71 down to the trial date. The mechanics of sale were complicated because of the necessity of proceeding under Section 509 of the Merchant Marine Act of 1936, 46 U.S.C.A. §§ 1159. During the war time emergency, the Commission, anticipating the need for a large number of vessels for war service, had placed such a large number of contracts for ship construction that "ship yards generally were not available for contract, private contract." As a result, a private operator, to obtain a tanker, was forced to proceed through the Commission. To keep within Section 509, the operator had to apply to the Commission for aid in the construction and acquisition of the particular vessel. As Fisher said, "That is the way the applicants made the application." If the Commission approved it would assign or allocate the vessel to the applicant and assign to him the Commission's interest in the construction contract. Fisher was familiar with all of the T2 and T3 sales by the

[3] Appointed by the President, December 7, 1943. Public Document 55A, Proclamations and Executive Orders relating to the United States Maritime Commission and the War Shipping Administration; 1943 A.M.C. 1443.

Commission in 1942 and 1943 and testified that "They were all of them sold under the provisions of Section 509 of the Act." A mortgage was executed in connection with each sale "as part of the purchase price" and covered "the balance of the tentative determined estimated selling price." All the vessels were sold at actual cost to the Commission with the final actual cost to be subsequently determined by the Commission. Sometimes, instead of cash down-payment, trade-ins of old vessels were allowed, but there were no trade-in transactions with respect to T2 tankers prior to October 1943. Because the procedure set-up required aid in the construction and acquisition of the vessel, even though a purchaser should wish to pay 100% cash, he would be restricted to a partial down payment. "The Maritime Commission retained title to the hull under construction up to the date it was completed. Then there was a simultaneous delivery by the shipyard of the completed vessel to the Maritime Commission and it in turn delivered it to the purchaser against the payment of cash and notes."

From all this the Commissioner concluded that:

"Despite all the legal smoke screen thus set up, in my opinion, the transaction amounted to nothing more nor less than a sale of the vessel to the purchaser as of the date of the delivery of the vessel. To be sure, the price was tentative and could vary either up or down as later estimates of cost might dictate, but nevertheless a sale had taken place.

"The conclusion to be reached then, is that there were sufficient sales of the T2 type tanker within a sufficiently limited period to constitute a market of this type of tank vessel. I think it can be reasonably said, also, that these sales were entered into by a party willing to sell and a party willing to buy."

■ We agree with the Commissioner that though the machinery of Section 509 proved cumbersome in handling these tanker sales, it clearly appears from the Commission representative's testimony that they were actual sales of a considerable number of T2 type tankers. We further agree with the Commissioner that the absence of competition, because of the selling at cost, only went "to reduce the price that would have been paid by a willing buyer if the seller had been motivated by a desire to make a profit on his investment."

On the point of comparability of the T2 tankers to the Virginia and the arrival at the market value of the latter, the libellant produced five expert witnesses. Three of these, Messrs. Bagger, Martin and Haight, are professional ship appraisers. Bagger has been a marine consulting engineer, surveyor and appraiser for over thirty years. Martin has been a marine consulting engineer and appraiser since 1912. Haight is also a marine consulting engineer, ship surveyor, valuing vessels. He has been in such business on his own account since 1909. All three witnesses showed a sound qualifying background of study and experience in their professions. This was not questioned. These witnesses had inspected the Pan Massachusetts, a Virginia type vessel. They had also inspected tankers of the T2-SE-A1 and T3-S-A1 type. They considered the T2 type ships comparable to the Virginia. With "certain adjustments or correction factors applied to take care of the increased speed and the larger dead weight of the Virginia" (as Bagger testified) the sales by the Maritime Commission to various private purchasers in 1942 and 1943 of T2 tankers were sales of vessels comparable to the Virginia.[4] On that premise, Bagger's opinion was that the market value of the Virginia on May 16, 1942 was $3,611,000. Martin's figure was $3,572,000, and in Haight's judgment the ship was worth $3,540,000.

The fourth witness for the libellant was Dietze, a ship and tanker broker for twenty years who said he had dealt with "practically all of the owners in this country of tank vessels." He thought that "we have sold more tankers in the last ten years than any other broker in the United States." He said he was 100% familiar with the performance of the

---

[4] Bagger gave as his opinion that the T3 type tankers were also comparable to the Virginia.

Virginia and T2 vessels from a business standpoint. He said that as far as delivering transportation is concerned, the only difference between the T2s and the Virginia is that the latter "simply delivers about 20% more oil." He did not think there was any difference between the vessels which would invalidate comparisons between them based on performance. In his opinion, taking the $3,000,000 sales price of the T2 tankers as a yardstick, he thought the market value of the Virginia was $3,600,000 as a minimum.

Libellant's final expert was a tanker operator, the executive vice president of an oil company which at the time of the trial operated about thirteen tankers. That number was 40% less than the company's fleet prior to Pearl Harbor. He was given a hypothetical question embracing the specifications of the T2 type tanker and the Virginia and the sales of the T2 ships in 1942 and 1943, and asked if he could form an opinion of the market value of the Virginia on May 12, 1942. He answered that he could and that he considered the Virginia to have been worth around $3,600,-000.

■ The government did not produce any evidence to offset this testimony of market value. It did bring out various differences between the T2 tankers and the Virginia and argues that the aggregate of these makes the market value testimony on behalf of the libellant untenable. Our independent examination of the record satisfies us that the Commissioner was justified in finding that the differences between the two types of ships were not radical and that they resolved substantially into the fact that the Virginia was a 20% more effective vessel which could deliver approximately 20% more pay load than the T2 tankers.

At the rehearing, evidence produced by the government indicated that the final determination of the costs of the T2 tankers by the Maritime Commission showed an average decrease in cost of $115,000. There was no testimony by either side as to the effect, if any, this would have on the valuation of the Virginia. The Commissioner held that the evidence was immaterial because the tentative prices at which the tankers were originally sold "represented sums which the purchaser of each vessel * * *, on the date of the sale, was willing to pay for that vessel." He said further, "It seems to me that a willingness to pay a certain sum on a certain date is excellent evidence of what a willing buyer would pay at or about that date, even though there was a provision for ultimate adjustment of the price. As far as anyone could tell at that time, the final price might well have been greater." We think that conclusion sound.

■■ With, therefore, comparable sales available and applied in establishing in the first instance the market value of the Virginia, appellant's argument that its construction cost must be the gauge cannot be accepted. If there was no market, that cost would be of assistance along with whatever other proper factors could be produced. But here where a market is shown to exist, and with sales in that market that can be reasonably used with corrective changes in arriving at the valuation of the Virginia, we think the Commissioner was entitled under the governing law to accept the comparable sales and discard the construction cost. As said in Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, "* * * the market value of the property * * * may be more or less than the owner's investment. * * * It is the property and not the cost of it that is safeguarded by state and Federal Constitutions." Relying on the construction cost of the Virginia to determine what a willing buyer would pay for it to a willing seller would be at best a guess. And that is particularly so under the testimony which establishes that the vessel was built under an unusually favorable economic situation not thereafter present and that for tax purposes, important ordinary cost items (builder's profit and overhead, for example) were eliminated. This last mentioned evidence supports the Commissioner's opinion that the figures offered by the appellant to show the construction cost of the Virginia "in fact show only a portion of that cost." Even with the comparable sales of the tankers, the estimation of the Virginia's market value by the experts involved "the use of

assumptions, which make it unlikely that the appraisal will reflect true value with nicety." United States v. Miller, supra 317 U.S. 369, 374, 63 S.Ct. 280.

■ Appellant also argues that the Virginia's value was enhanced contrary to Section 902 of the Merchant Marine Act, supra, by the causes necessitating the government's taking or use of vessels for the national emergency. The statement is made that "It ought not to be questioned that war time earnings are the enhancement factors to which the statute relates." We are referred to no authority in support of this nor have we found any. It is true that there is testimony for libellant to the effect that the scarcity of tankers, due to war conditions, made them more valuable. It seems to us that this comes rather within the language of Rule 4 of the Advisory Board's Rules on Just Compensation, supra, which reads: "Enhancement due to a general rise in prices or earnings, whenever occurring should not be deducted." Certainly there is a plentitude of testimony bulwarking the proposition that the government in this instance is not being required to pay more for the Virginia, as of May 12, 1942, than private operators would have paid, buying it for their own use. As the Commissioner stated it "appears from the uncontradicted testimony that the market value of the Virginia and, indeed, of all ships was higher in 1941 than in 1942."

■ The Commissioner found that the market value of the Virginia on the date of the known loss, May 12, 1942, was $3,584,000. That finding has the substantial foundation of credible evidence. After "critical examination of all the testimony and documentary proofs" it was adopted by the District Court as proper and valid. We do not think it should be disturbed.

Interest on the valuation allowed was fixed by the District Court at 4% to run from the date of suit. Libellant who is cross appellant on this branch of the litigation contends that the interest should have run from the date of the known loss.

The specific authority for this suit found in Section 225 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1128d, reads: "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance * * * an action on the claim may be brought * * *." The section also provides that "Said suits shall proceed and shall be heard and determined according to the provisions of [the Suits in Admiralty Act] insofar as such provisions are not inapplicable and are not contrary to or inconsistent with the provisions of * * * this title." Section 5 of the Suits in Admiralty Act as amended in 1932 reads in part, "And provided further, That no interest shall be allowed on *any* claim prior to the time when suit on such claim is brought as authorized hereunder".[5] (Emphasis ours.)

When the Insurance Subtitle amendment to the Merchant Marine Act was submitted by the Maritime Commission to the Con-

[5] Section 5 of the Suits in Admiralty Act reads in full as follows: "Suits authorized by this chapter may be brought only on causes of action arising since April 6, 1917: Provided, That suits based on causes of action arising prior to the taking effect of this chapter shall be brought within one year after this chapter goes into effect; and all other suits hereunder shall be brought within two years after the cause of action arises: Provided further, That the limitations in this section contained for the commencement of suits hereunder shall not bar any suit against the United States or the United States Shipping Board Merchant Fleet Corporation, formerly known as the United States Shipping Board Emergency Fleet Corporation, brought hereunder on or before December 31, 1932, if such suit is based upon a cause of action whereon a prior suit in admiralty or an action at law or an action under section 250(1) of Title 28, was commenced prior to January 6, 1930, and was or may hereafter be dismissed because not commenced within the time or in the manner prescribed in this chapter, or otherwise not commenced or prosecuted in accordance with its provisions: Provided further, That such prior suit must have been commenced within the statutory period of limitation for common-law actions against the United States cognizable in the Court of Claims: Provided further, That there shall not be revived hereby any suit at law, in admiralty, or under sections 40(20), 250, 251, 254, 257, 258, 287, 289, 292, 761-765 of Title 28 heretofore or hereafter

gress, the Chairman of the Commission, Admiral Land, wrote: "It is also desirable to prescribe adequate legal machinery for the suits against the United States, including provision for payment of judgments, payment of interest thereon, payment of costs, countersuits and set-offs, and removal of suits. *This can be accomplished by provisions like those in the Suits in Admiralty Act.* (Hearings before the H. R. Committee on Merchant Marine and Fisheries on H. R. 6572, 76th Cong., 1st sess., p. 83.)" (Emphasis ours.)

The House and Senate Committee stated concerning the bill: "Section 225 permits claimants on account of insurance under this legislation to sue the United States in the United States District Court for the district in which the claimant resides and *prescribes adequate legal machinery for such suits, including provision, by reference to the provisions of the Suits in Admiralty Act, for payment of judgments, payment of interest* thereon, and payment of costs, and for counter-suits and set-offs, and for removal of suits. (H. Rep. No. 2499, 76th Cong., 3d sess., p. 7; S.Rep. No. 1942, 76th Cong., 3d sess., p. 10.)" (Emphasis ours.)

Section 225 was enacted as originally drafted and proposed by the Maritime Commission. There is a sound inference, we think, from this late legislative history that the language concerning interest in Section 5 of the Suits in Admiralty Act was taken at its face value as meaning that interest on claims under the Insurance subtitle of the Merchant Marine Act, would not be allowed prior to suit.

In the only reported appellate construction of the interest provision in the suits in Admiralty Act which we have seen, the Second Circuit Court of Appeals in The Wright, 109 F.2d 699, 701, has so interpreted the statute, saying: "By amendment of 1932, 46 U.S.C.A. § 743a, it is now provided that no interest shall be allowed on any claim prior to the time when suit is brought."

The problem is not free from difficulty.

The legislative history of the 1932 amendment to Section 5 of the Suits in Admiralty Act points to the adoption of that amendment in order to take care· of a special class of cases as to which the time for suit was revived or extended. When the then bill left the House Committee on Legislation and Ocean Mail Contracts, it apparently did not contain the provision regarding interest on claims, for that committee added to the end of the bill (where the interest proviso now appears) the clause about the nonrevival of suits dismissed for lack of prosecution. 72d Cong., 1st Sess., H.Rpt. 1012.

The House Judiciary Committee in giving the purpose of the bill stated that it was to take care of the designated actions and as to interest said, "No interest will be allowed from the date of the loss." The Senate Committee in its report reiterated the specific purpose of the amendment. 72nd Cong., 1st Sess., Sen.Cal. 821. Its reference to interest was, "Nor will any interest be allowed on claims prior to the time of the institution of the new actions under this bill." But none of that limiting terminology was in the interest proviso when the bill was finally enacted. As the amendment appears in 47 Statutes at Large, p. 420, the subcaption of the interest proviso simply reads, "interest on claims," in contradistinction to the other proviso headings which have language specifically directed to the class of suits to which they refer. With the admittedly general phrasing of the interest clause in no way curtailed, it can be readily appreciated why, eight years later, the Maritime Commission and the Congress considered that there already existed in the Suits in Admiralty Act adequate legal machinery to control the payment of interest on such a claim as is now before us.

■ In the situation, it is not at all clear that the interest clause of the 1932 amendment was intended to merely relate to a named group of suits. The language itself is plain, as is the reliance placed upon it by the Maritime Commission and

---

dismissed for lack of prosecution after filing of suit: And provided further, That no interest shall be allowed on any claim prior to the time when suit on such claim is brought as authorized hereunder. Mar. 9, 1920, c. 95, § 5, 41 Stat. 526; June 30, 1932, c. 315, 47 Stat. 420."

the Congress in connection with the 1940 Insurance Subtitle. If the purpose had been to confine the no-interest-prior-to-suit provision to a stated class of actions that could have been readily accomplished by appropriate phraseology such as had been used in earlier comments on what was at the time pending legislation. It can still be so restricted if the Congress so wishes. But as it stands, we are not free to infer that the United States has thereby authorized interest against it from the date of the loss of the Virginia. As said by the Supreme Court in United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577: "Thus there can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed."

See also United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521; Albrecht v. United States, 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532.

As we see it, the interest provision of Section 5 of the Suits in Admiralty Act is applicable and not contrary to or inconsistent with the provisions of the 1940 Insurance Subtitle of the Merchant Marine Act. Since the interest provision governs the facts before us, any implications which might arise out of language in Standard Oil Co. of New Jersey v. United States, 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519, which had to do with the War Risk Insurance Act of 1914, 38 Stat. 711, 712, are not pertinent. With reference to the phrase "just compensation" appearing in Section 902 and in the Advisory Board's rules, as said in United States v. Thayer-West Point Hotel Co., supra., 329 U.S. at page 590, 67 S.Ct. at page 400, "Mere use of the term 'just compensation,' without more, is no substitute for an express provision for interest."

We conclude, therefore, that the District Court was correct in deciding that interest on the valuation sum, runs only from the suit date.

One further point remains. The decree which awards the principal sum with interest from the date of the institution of the action then provides for "interest at the rate of 4% per annum *on the aggregate amount of this decree from the date thereof until paid*". (Emphasis ours.) The Government complains that this results in compound interest being allowed.

The valuation interest is palpably a part of the main award and so intended. It is proper in theory and in practice. "Interest in such a case is allowed as well as costs; and in case of appeal, the interest is cast upon the whole amount of the decree in the court below; including the costs as well as the amount of the damage." The Wanata, 95 U.S. 600, 613, 34 L.Ed. 461.

The judgment of the District Court will be affirmed.