### DE LA RAMA S. S. CO., Inc. v. UNITED STATES.

### THE DONA AURORA.

### No. 295, Docket 22298.

United States Court of Appeals
Second Circuit.

Argued on Remand from Supreme Court of United States April 10, 1953.

Decided Aug. 19, 1953.

---

Myles J. Lane, U. S. Atty., New York City, Benjamin H. Berman, Attorney, Department of Justice, New York City, of counsel, for appellant.

Burlingham, Hupper & Kennedy, New York City, Norman M. Barron, Hervey C. Allen, Jr., and Roscoe H. Hupper, New York City, of counsel, for libellant-appellee.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The motor vessel, Dona Aurora, was delivered to the War Shipping Administration on April 1, 1942, by the appellee, its owner, in accordance with an understanding that a time charter would be executed and that was done on April 24, 1942. The charter was for about a year and the vessel was valued at $1,500,000 for which amount a War Risk Insurance binder was issued in March and delivered to the owner on May 9, 1942.

On May 20, 1942, the War Shipping Administration gave the owner notice of its requisition of the vessel "for use under time form charter," further advising that:

"Requisition charter in form set forth in Federal Register of May 16, 1942 together with rates and insurance valuations contained in General Order 8 and 9 published Federal Register May 16, 1942 will be tendered you as soon as possible. Please advise immediately whether you desire to have these rates and valuations made effective as of time of delivery under current charter, * * *."

As the result of steps subsequently taken by the parties, a war risk insurance binder was issued under which the War Shipping Administration insured the vessel from the time of her delivery to it to the termination of the charter to the amount of just compensation to be determined in accordance with Section 902 of the Merchant Marine Act of 1936, as amended.[1]

Though the requisition charter was not executed until March 18, 1943, it was made effective as of the date of the delivery of the vessel, April 1, 1942. The vessel was sunk by the enemy on December 25, 1942, and became a total loss. Efforts to secure an adjustment of its insurance claim having been unsuccessful, the owner filed this libel on December 22, 1944, pursuant to Section 225 of the Merchant Marine Act of 1936 as amended. See Section 1128d of Title 46 U.S.C.A.[2]

Before hearing on the merits there was a reference to a commissioner to determine and report the amount of just compensation for the loss of the vessel. The appellant urges that this reference in advance of trial was error. But since a reference for the purpose of determining just compensation was a permissible exercise of discretion under the Admiralty Rules of the Supreme Court and since the subsequent trial of the issues has shown that the determination of just compensation was necessary, the appellant has not shown itself to have been harmed by the order of reference.

The commissioner returned values as of the date of the delivery, April 1, 1942, and as of the date of the sinking; but as the parties are now in agreement that the date of the sinking is the critical date we shall confine ourselves to that valuation. The commissioner found the fair value of the vessel on that date to be $2,082,000 and Judge I. R. Kaufman in the district court confirmed that. The decree was for that less $1,000,000 which had been paid, plus the stipulated value of the consumable stores lost, plus interest at four per centum from the date of the filing of the libel to the date of the decree. The United States appealed and both parties filed assignments of error. The appellant now insists that the vessel was valued on an improper basis which made the amount too high; and that there was a failure to exclude enhancement on account of the causes necessitating the taking or use, as required by Section 902(a) of the Merchant Marine Act of 1936 as amended, 46 U.S.C.A. § 1242(a). The appellee contends that a duplication of deduction for depreciation and the failure to include interest from the date of the loss as part of just compensation deter-

1. The requisition charter provided in part:
"E. War Risk Insurance Valuation
*   :   *   *   *   *   :

"Option II.—Just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended, for any loss or damage due to the operation of a risk assumed by the Charterer under the terms of this Charter to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage."
Section 902 of the Merchant Marine Act of 1936, as amended, read in relevant part:
"When any property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use."

2. The repeal of this statute did not deprive the court of jurisdiction. De La Rama S.S. Co. v. United States, 344 U.S. 386, 73 S.Ct. 381.

mined in accordance with Section 902 made the value as found too small.

The vessel was one of three sister ships which were built at Trieste, Italy for the libellant, a Philippine corporation, and was delivered to her owner on October 4, 1939. Her total cost was $904,360 and in September, 1941, a gyroscopic compass was added to her original equipment at a cost of $18,363. She was a cargo vessel constructed under the supervision of Lloyd's surveyors and was given Lloyd's highest classification. She was registered in the Philippines and flew the American and Philippine flags in her regular service between Philippine and Far East ports and the United States, having made six or seven round trip voyages before she was delivered, in first class condition, to the War Shipping Administration.

Her overall length was 439.4 feet, breadth 57.7 feet and depth 37 feet. Her certified dead-weight capacity was 8920 tons, her bale cubic capacity was 445,000 cubic feet and her certified loaded speed was 14.2 knots with 5200 brake horsepower, diesel. She had five holds, five hatches, two decks (with a third deck in No. 1 compartment) two masts, four Kingposts, electric winches, transverse framing and was of riveted contruction.

■ In determining value there are, unfortunately, no inflexible rules ready at hand and easily applied. Cf. United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 70 S.Ct. 217, 94 L. Ed. 195. But where what is to be valued is bought and sold in the ordinary course of business, the market price thus established by willing buyers and sellers it is to be taken as the measure. The Petar [Ozanic v. U. S.], 2 Cir., 165 F.2d 738, 740.

There had been sales of comparable vessels between May, 1942, and August, 1943, when the Maritime Commission had sold to American interests eighteen of its type C–1B ships, at an average price of $1,129,236, for operation on designated trade routes as authorized by Title 46, Sections 1151–1153, 1156 and 1212 U.S.C.A., but we do not think those sales established a market price which should be used here. They were restricted in accordance with the subsidy agreements under which the vessels were constructed and were made at about half what it cost to build them in consideration for substantial limitations upon the purchaser's right to use and dispose of them, including a limited right to compensation if they were requisitioned. That was a controlled market which was the result of the use of subsidies, and the sale price of a new ship at about half what it had recently cost the seller to build her seems far from being a fair equivalent of a market price established by ordinary business dealings at arm's length. As the judge remarked "If the Government had been *giving* ships away to a limited group of American shipping companies for use in the foreign trade subject to restrictions aforestated, which would not have been an unlikely procedure, surely it could not come in now and say that similar type requisitioned ships (not so given or limited in use) had no value based on an established 'market.'"

The appellant seeks to support its contrary conclusion by National Bulk Carriers, Inc., v. United States, 3 Cir., 169 F. 2d 943. The construction and sales of those tankers by the Maritime Commission were, indeed, regulated and controlled and in that sense no free market and resulting market price were shown, but other considerations made the sales prices fairly reflect actual market value, among them the fact that all the vessels were sold for the final actual cost to the Commission as determined by it. On the whole the Commissioner in that case concluded that actual sales in considerable numbers had been made of the tankers by a willing seller to willing purchasers to establish a market for comparable vessels at a price to be taken into account in determining just compensation for the vessel lost, and the court agreed. But, even though a considerable number of sales at prices which reflect fair value, save only what might have been a fair profit for the builder, may establish what is an acceptable guide to indicate a fair, free market price, we think such a situation should be distinguished from that

here where the builder sold for about half its cost of construction.

Moreover, it appears that in the fall of 1941 the Maritime Commission sold two C–1B vessels without subsidy restrictions at their full construction cost of $2,247,-054.61 each and in January 1942 another on like terms at $2,217,216.88. Though not enough vessels were thus sold to establish a market they were much more nearly the kind of sales which were the basis for the decision in the case just mentioned.

▮ Absent a market price to use as a yardstick, it was proper to turn to other relevant factors. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. The commissioner did that. He found that the net earnings of the vessel in 1940 were $136,576.72 and in 1941 $412,894.03, the only two full calendar years in which she was operated before this country entered the war. For three months after her use was requisitioned, the British Ministry of War Transport operated her under a sub-charter at a daily hire more than twice what was paid the libellant. Her earning ability was thus shown to be good though the amount should have been, as it was, considered in the light of the abnormal conditions prevailing. The commissioner found that when she was delivered to the libellant she was valued for insurance at $1,500,000 and, as has already been noted, that was her valuation under the first War Shipping Administration charter, although the libellant subsequently tried to have it increased to $2,000,000 and succeeded only in getting permission to place additional insurance on its own account. It then did so but discontinued it because of the high premium rates. A sister ship was, however, appraised for insurance in January 1942 at $1,960,000.

▮ The factor given most weight in determining just compensation was the domestic reproduction cost on a multiple ship basis as of the date of loss in 1942 less depreciation. The argument of the appellant that it was erroneous to do that without giving consideration to foreign reproduction costs is adequately met by the fact that there was, as the commissioner reported, "no reliable evidence as to foreign costs

during that period and if the Dona Aurora could have been sold, she necessarily would have been sold in the United States. The Petar, 165 F.2d 738, 1948 A.M.C. 340." Reconstruction cost less depreciation is an accepted guide to lead the way to the determination of the value of a vessel when market value cannot be shown. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; United States v. Eastern S. S. Line, Inc., 1 Cir., 171 F.2d 589; The Petar, supra; The Hisko, 2 Cir., 54 F.2d 540.

Recognized experts were called by each party and testified in considerable detail as to the estimated domestic cost of reproducing the Dona Aurora on a multiple ship basis as of December 25, 1942, and as to the proper rate of depreciation to be applied in determining value. The estimated costs of reproduction ranged between $2,-390,000 and $2,580,000, and the rates of depreciation varied between 2½% and 5%. The commissioner found the cost of reproduction on the date of the loss, used a 3⅓% rate of depreciation, and, after making adjustments for the cost of the gyroscopic compass and the cost of repairing minor marine damage not covered by the war risk policy, arrived at an "adjusted figure" for the date of loss of $2,222,171. He then gave consideration to that figure and, as his report states, to "the general characteristics of the Dona Aurora, her earnings prior to requisition, the various insurance valuations placed on the vessel as well as on her sister ships, and all the relevant facts before him on this matter, including the uncertainties of the pending war and the depressive effects of Government controls on shipping" and found that the fair market value of the vessel on December 25, 1942 was $2,082,000. He also reported specifically that no part of that sum "represents enhancement by reason of causes necessitating the taking or use of the vessel by the United States of America." Thus it would seem that he discounted reproduction cost less depreciation by about $140,000 because of the depressing effect of Government controls on shipping.

▮ This overall finding of value is a question of fact which, having been given

added weight by its confirmation by the judge after hearing exceptions to the report, should now be given effect unless clearly erroneous. The Petar, supra; Petterson Lighterage & Towing Corp. v. New York Central R. R. Co., 2 Cir., 126 F.2d 992. We find no error in the manner in which this ultimate finding was made. It is significant also that it fairly followed the pattern provided by Rule 3 in the Report of the Advisory Board on Just Compensations to the Director of the War Shipping Administration on December 7, 1943, 1943 A.M.C. 1444.

■■ Nor does the appellant have a sound basis for its argument that the valuation was improperly enhanced because of the Government's demand for ships. It is hard to see how that element, which would ordinarily enhance the market price, could have been included in a valuation that was not based on market price. The enhancement to be excluded is not the added cost of labor, materials and the like which is an inevitable result of wartime economy but the increase in the price level of such ships as the Dona Aurora due to the added demand for them because of the need of the Government for that type of ship. United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392. Nothing in this record belies the flat statement of the commissioner that no such enhancement was included in his valuation.

■ The sum of approximately $140,-000, which we have already referred to as something which the commissioner seems to have deducted from reconstruction cost to adjust that with due regard for the depressive effect of Governmental controls, is what the appellee insists was a double deduction for depreciation. But since the record does not bear out appellant's assertion no error in that regard appears. Nor can we sustain the appellee in its position in respect to allowance of interest from the date of the loss as a necessary element of just compensation. The acquisition of the use of the vessel by the War Shipping Administration was followed by a charter which the parties executed, which covered the entire period of the use of the ship, and which contained no provision for the payment of interest. This suit is on an insurance contract complying with the terms of the charter which provided for the payment of just compensation without any provision for the inclusion of interest as a part of that. Absent such a provision for the payment of interest none is recoverable. New York & Porto Rico S.S. Co. v. United States, 2 Cir., 29 F.2d 1014; National Bulk Carriers, Inc., v. United States, supra. Cf. United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521; United States v. Goltra, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776.

Affirmed.

CLARK, Circuit Judge (dissenting).

When a ship costing $904,360 in October, 1939, is valued at $2,082,000 on its sinking three years later—an increase making the total over 230% of the original, or 225% if the gyroscopic compass is thrown in— and this in a market where by law all enhancement due to the war needs is excluded, the result is sufficiently surprising as to suggest suspicion of error. Examination of the record leads to the conclusion that not one but a series of errors occurred. It turns out as a matter of fact that the valuation was not made by a judge, but by an admiralty proctor; and it has since been accepted by the several judges substantially because valuation is too vague and unsubstantial a matter to be really susceptible to rules definite enough to justify reversal. That is not the approach of the Supreme Court. United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195, reversing a valuation below. And it seems to me undesirable, reducing the process to a kind of compulsory arbitration. I do not object to that as such when it is the law or the parties' contract; I do protest its being regarded as judicial process, and so treated for the purpose of review.

Thus I regard as the initial and conditioning error the reference of this case at its beginning to a commissioner or a special master. In this I do not intend to criticize the commissioner personally; I have not the honor of his acquaintance or knowledge of him beyond the fact that he

is a distinguished member of the admiralty bar. And he seems to have carried out the task set before him with professional competence. When a bishop is assigned to try Satan, we surely cannot object to a finding of guilt made with professional skill and directness. But we can question the assignment. The Supreme Court has long made known its objections in civil actions to the depriving of litigants of judicial adjudication through the process of reference to masters; and the principle has been embodied in the civil rules and often applied by us and other courts. F.R. 53 (b); McCullough v. Cosgrave, 309 U.S. 634, 60 S.Ct. 703, 84 L.Ed. 992; Newman & Bisco v. Realty Associates Securities Corp., 2 Cir., 173 F.2d 609, and cases cited at 611; Prudence-Bonds Corp. v. Prudence Realization Corp., 2 Cir., 174 F.2d 288. The same principle is held to apply in admiralty, at least to the initial and policy-settling adjudications of a case, as distinguished from the settling of details of damage, once the policy and method are established. United States v. Kirkpatrick, 3 Cir., 186 F.2d 393. That principle would seem particularly pertinent here, where the rules accepted for himself by the commissioner absolutely conditioned the result.

Of these rules the basic one, which actually led to the over-all so generous result, was, as the record clearly demonstrates, the use of the principle of "cost of reproduction new less depreciation." As is now well known, the use of this principle by the Supreme Court in testing the constitutionality of governmental utility and railroad rate regulation led to the famous attacks upon it by Justice Brandeis and scholars for its artificiality and unreality. So devastating were these attacks that the Supreme Court eventually retreated, Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L. Ed. 333, and the principle has fallen into substantial disuse in the field of its origin. See Note, Original Cost Rate Regulation and Inflation, 66 Harv.L.Rev. 1274; United States v. Toronto, Hamilton & Buffalo Navigation Co., supra, 338 U.S. at page 403, 70 S.Ct. at page 221. The concepts here necessary for the rule's application

that this Italian built vessel was to be rebuilt, *in America* and *at the height of war prices*, seem to me to involve even more unreality than that attacked in the operation of the original rule. Of course no vessels were thus built; the rigid governmental controls prevented any building of ships except by the Maritime Commission. So this method of valuation seems to me sheer guesswork—at the height of the market therefor. And if this is not enough of itself, the result should be held vitiated in any event because the experts whose evidence as to the cost of reproduction was relied on testified frankly that they had taken no account of the depressing effects of governmental controls. So the figures are surely out of never-never land.

As the figures themselves demonstrate, the process was that these high values of the experts were accepted as basic; they were then subject to a deduction for depreciation at a moderate rate; and thereafter a further deduction of $140,000, of vague and indefinite purpose, was made to reach the final result. This last deduction is apparently the saving grace which is relied on to make the general result palatable. Surely without it the result could not possibly have been sustained. But it has so little connection with any apparent reality, as not merely to make natural the protective appeal libellant has based upon it, but also to render its use ineffective to sustain the result. I do not think it can be held to operate at all as meeting the requirements of the statute prohibiting enhancement of value for war causes, 46 U.S.C. § 1242(a), or the Rules of the Advisory Boards on Just Compensation. See United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392; United States v. Toronto, Hamilton & Buffalo Navigation Co., supra, 338 U.S. at page 405, 70 S.Ct. at page 222; and our opinions in American-Hawaiian S. S. Co. v. United States, 2 Cir., 191 F.2d 26, certiorari denied United States v. American-Hawaiian S. S. Co., 342 U.S. 941, 72 S.Ct. 553, 96 L.Ed. 700. No attempt at even approximating exactness or specific figures is made; the results suggest a reduction of 12 or 13 per cent in the over-all enhance-

658

ment for governmental controls. This would seem entirely inadequate both in amount and in method as a means of discounting war values.

As the opinion discloses, the commissioner rejected the values shown by sales of comparable vessels made very close to the time in question by the Maritime Commission under subsidy agreements and restrictions as well as of sales made in 1941 at cost. This would seem clear error under Rule 3 of the Advisory Board on Just Compensation and the cases cited above; and National Bulk Carriers, Inc., v. United States, 3 Cir., 169 F.2d 943, is contrary. Whether the market was thus government-controlled or not, it was the one and the only one then actually existent. To reject these values for cost of reproduction new less depreciation is to reject fact for fiction. These values should have been considered for at least moderately persuasive effect, although I am bound to believe that a more nearly accurate course under the circumstances here would have been to have taken the original cost of the vessel as a sound starting point, to be increased by the amount of the general rise in price level, excluding, of course, the peculiar increase in shipping costs due to the war exigencies, to find the final result. Compare 66 Harv.L.Rev. 1274, cited above.

In my dissent in American-Hawaiian S. S. Co. v. United States, supra, 2 Cir., 191 F.2d at pages 29-31, I expressed the view that the decisions were substantially setting aside the statute prohibiting war enhancement of value, 46 U.S.C. § 1242(a), supra, perhaps in part because of serious doubts of its constitutional validity, and that a decision clarifying its operation beyond United States v. Cors, supra, 337 U. S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, was necessary. I reiterate and incorporate by reference here the views there stated. The fact that the Supreme Court there denied certiorari, while not conclusive, as we are often told, makes further emphasis rather unprofitable at the moment. And what seem to me the other extensive errors here present makes reliance on these views less important in the present case. I would reverse for a new valuation.