OZANIC v. UNITED STATES.

THE PETAR.
No. 107, Docket 20789.

Circuit Court of Appeals, Second Circuit.
Jan. 9, 1948.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libellant.

John F. X. McGohey, U. S. Atty., of New York City (Edward L. Smith, of New York City, of counsel), for respondent.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

In a collision between the United States tanker "Kennebec" and the Yugoslavian steamship "Petar" in the Caribbean Sea on March 8, 1942, the "Petar" was cut in two and, with her entire cargo of bauxite, became a total loss. Only seven of her officers and crew survived. The "Kennebec," which was also damaged, stood by, rescued the survivors, and landed them at Recife, Brazil.

Three suits were brought in the District Court for the Southern District of New York to recover damages resulting from the collision and they were consolidated for trial. An interlocutory decree, entered by consent, disposed of some of the issues and provided for the reference to a commissioner for hearing and report on those still in controversy. Because the issues were thus narrowed, the consolidated ac-

tion may, for present purposes, be treated as a suit in which Ozanic, the master of the "Petar," who will now be called the libellant, sued the United States, which will be called the respondent, as owner of the "Kennebec," and the United States filed a cross-libel to recover the damages its ship sustained. The fault of both vessels was conceded by the parties and it was agreed that the damages should be apportioned, with the United States bearing two-thirds of them.

The commissioner heard the parties and filed his report to which they both excepted. The trial court overruled all the exceptions and entered the final decree from which both parties have appealed. The issues which are now in dispute are (1) the value of the "Petar" on the date of loss; (2) the liability of the United States to share the payment of the expenses of repatriating certain members of her crew, as well as their wages from the time of the sinking until the time of their repatriation; and (3) the liability of the United States to share the "Petar's" loss of profits which would have been, under a time charter, earned on the voyage or in the alternative, during the remaining period of the charter, had she not been lost. The commissioner found the value of the "Petar" to be $170,000. Recovery for the other items of loss was denied.

### Value of the "Petar."

As the value of the "Petar" on the critical date is a question of fact, the commissioner's finding, confirmed by the district judge, should be upheld unless clearly erroneous. The questions which must be resolved are whether all the relevant factors which the law requires to be given effect were duly considered and, if so, whether the evidence adequately supports the finding.

The "Petar" was a single screw steamship with an over-all length of 265 feet. Measured by her peacetime Plimsoll marks she was of 2787 deadweight tons which, measured by her wartime marks, were increased to 2850. According to the testimony of her master, she had a triple expansion reciprocating engine which gave her about 750 horsepower at normal pressure and enabled her to make an average speed of 8.84 knots. She had Lloyd's highest classification of plus A-1. She had been built in 1910 in Holland at a cost of about $171,000; had been sold in 1932 for $16,262, which was approximately her then salvage value; and had been purchased by her last owners in 1936 for $33,269. She was fitted for trans-Atlantic service but when lost was engaged in the bauxite trade between Georgetown, British Guiana, and St. Thomas, Virgin Islands. She then carried war risk insurance of $156,200, the maximum amount she could obtain.

She had been requisitioned by the Yugoslavian Government and could not be sold, transferred, or used in any other service without the consent of both Yugoslavia and Great Britain. In addition in order to obtain whatever ship warrants would be needed in ports of the United Nations, she had to comply with certain conditions imposed as to charter hire and rates of pay.

It is well settled that the valuation of a ship lost in a collision should be upon the principle of restitutio in integrum. The owner of a ship totally lost is entitled to recover the gross sum which could have been obtained just before the collision in a sale resulting from negotiations between a willing seller and a willing buyer who gave fair and reasonable consideration to all relevant facts. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890. There is no one fixed basis which is decisive where a free and open market for such ships does not exist to establish fair market value. Rather, the basis of valuation is a composite one which gives an end result in each instance approximating actual value as closely as possible. The Hisko, 2 Cir., 54 F.2d 540.

An inspection of the record shows that the commissioner's finding that no market existed in March, 1942, which would establish a fair market value for ships of the size and type of the "Petar" was not clearly erroneous, and this point is not seriously argued on appeal. Such an inspection also shows that the factors which are relevant in the absence of an open market were considered and evaluated in this instance. One of those was

properly reconstruction costs less depreciation, a method of valuation which though not the "measure or sole guide"[1] is one that nevertheless "may be deemed a reliable indication of the minimum value."[2] The main controversy on appeal relates to the rate of depreciation[3] used.

As is usual in such cases, both parties relied upon the testimony of expert witnesses and, as is also usual, their evidence was conflicting. One of libellant's experts, Haight, took the reproduction cost in this country on a multiple ship basis of a vessel of the size and type of the "Petar" which he testified was about $508,000 and then depreciated it at the rate of 2½%. Thus he set the "Petar's" value at $225,000 with her deadweight tonnage figured at 2787 and at $232,000 with it figured at 2850. Libellant's expert Bagger set the "Petar's" reproduction cost on a multiple ship basis at $470,000 and at 25 to 30% more on a single ship basis. He also applied a depreciation rate of 2½% and thus valued the "Petar" at $210,000.

The respondent's experts Hodges and Sturm also based their valuations upon reproduction cost less depreciation. Hodges set the single ship reproduction cost in the United States, which he thought the same as the multiple ship reproduction cost, at about $500,000 and took off depreciation at 5%, which resulted in a valuation of from $95,000 to $100,000. Sturm estimated the American reproduction cost at $581,000 on a single ship basis and by depreciating that at 5% arrived at $113,000 as the value. He also considered the foreign reproduction cost to be one half of the American, and applied to it a 4% depreciation rate, thus estimating the value of the "Petar" to be about $78,000. The foreign single ship reproduction cost was stipulated, however, to be $343,400, so that, depreciating it at Sturm's rate of 4%, the value arrived at is about $93,000. Another expert for the respondent, Stanley, differed greatly. He took as his basis the original cost of the ship at $171,000 and first deducted a yearly age differential of 5%, which was offset to some extent by adding a yearly age differential of 5% to the value during the periods of the two World Wars, and reached the conclusion that the value of the "Petar" was $73,233 on the critical date.

The commissioner's report shows that he considered not only the conflicts but also the accords of this expert testimony and did that in connection with the evidence of the original cost of the "Petar," her repair and conversion cost, earnings, physical condition and availability for use in view of the restrictions upon her when sunk. He took reproduction cost on the multiple ship basis in the United States as one of the factors for the computation since the only ships being built here in 1942 were built on that basis, and since if sold anywhere the "Petar" would have been sold here.[4] Cf. The Hisko, supra, 54 F.2d

---

[1] Standard Oil Co. v. South Pacific Co., supra, at page 156 of 268 U.S., at page 467 of 45 S.Ct.

[2] The Hisko, supra, at 541 of 54 F. 2d.

[3] "Depreciation" here is not used in its ordinary accounting sense. It does not refer to an annual allowance made for wear and tear or the amount which each year is set aside on the books in a "reserve" in order that the original cost of the object being depreciated will be wholly written off at  e end of its anticipated life span. h. .her it refers to a factor which is determined by subtracting each year a percentage of the residual value of the object carried over from the last year. The value is not, however, the original cost of the ship, but its estimated reconstruction cost as of the year in which the valuation is made. And the percentage of "depreciation" in this sense apparently varies with market conditions. For purposes of clarity, the percentage rate thus progressively applied to the "reconstruction cost" should perhaps be called an "age differential percentage." But since both parties, the Commissioner, and the District Court all termed it the "depreciation rate," we will continue to designate it as such.

[4] Respondent argues that reproduction cost abroad rather than in the United States should be used, on the ground that since the "Petar" "was not available to be used in the United States coastwise trade, nor eligible for subsidy and she was too small to be used in foreign trade," it is "highly unrealistic" to use reproduction costs here. But clearly, if she would have been sold at all she probably would have been sold in the United States where, as the commissioner found, the market was highest.

at 541. As the experts were in general agreement that this cost was about $500,000, he accepted that figure. He considered in view of all the circumstances shown that the relationship of age to selling price in March, 1942 varied as the judgment of sellers and buyers was influenced by the various relevant market factors, such as the extent of demand compared to supply, the restrictions to which ships were subject, their earning power, and the amount of war risk insurance obtainable. He decided that the fair depreciation rate was between the 2½% taken by the libellant's experts and the 5% applied by the two respondents' experts who used the reproduction cost method. His finding of $170,000 as the value was made, not by taking the reconstruction cost less depreciation method as controlling, but by using that as a part of a "composite based on all the evidence," and apparently also as a sort of check upon his result.

■ This finding by the commissioner was properly treated by the trial judge as entitled to great weight and to be given effect unless there was a clear mistake in arriving at it. Tilghman v. Proctor, 125 U.S. 136, 149, 8 S.Ct. 894, 31 L.Ed. 664; The Elton, 4 Cir., 83 F. 519; The Gertrude, D.C.R.I., 112 F. 448, affirmed, 1 Cir., 118 F. 130. We now should accord it the added weight confirmation by the court gives it. We reverse a fact finding only if it is clearly erroneous. Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992. It is not apparent that error entered into the tentative way all the various factors were used by the commissioner as an approach to the ultimate finding of value.

■ Certain specific objections to the finding, not mentioned above, have been pressed upon us, but they are all without merit. On the one hand, the respondent claims that the amount of the "Petar's" war risk insurance, $156,200, represents her "virtual ceiling value." The libellant, on the other, contends that the commissioner was in error in even admitting evidence of the amount of insurance for purposes of determining value. Ordinarily it may be true that such evidence is irrelevant. Union Pac. R. Co. v. Lucas, 8 Cir.,

136 F. 374; Adelphia Hotel Co. v. Providence Stock Co., 3 Cir., 277 F. 905. But here, as the court pointed out, during a period of war when there is a high rate of sinkings, a prospective buyer would naturally consider the amount of insurance that could be obtained in case of loss. But of course this does not mean that this amount would be the maximum price he would pay, as is shown by the fact that two British ships sold in May, 1942 brought prices 22% above the amount of their war risk insurance. Obviously numerous other variables would enter into the buyer's decision, and the amount of war risk insurance obtainable is but a make-weight at best.

■ The respondent also argues that the commissioner failed to give full weight to such factors as the "Petar's" physical condition and the governmental restrictions on her. His report shows, however, that these matters were considered. And we cannot examine his thought processes. Fayerwether v. Ritch, 195 U.S. 276, 305-307, 25 S.Ct. 58, 49 L.Ed. 193; Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 999, 82 L.Ed. 1129; United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429.

■ It is the contention of the libellant in effect that there was manifest error in the commissioner's failure to use the depreciation rate of 2½% in ascertaining reproduction cost less depreciation. The 2½% figure was approved, it is pointed out, by the Supreme Court and this court in two cases arising out of collisions in World War I. Standard Oil Co. v. South Pacific Co., supra; The Hisko, supra. The libellant would have us hold that conditions in the two wars were so precisely similar that exactly the same rate of "depreciation" must be used now as was approved before. While his expert Bagger testified to the effect that the greater shortage of shipping in the second war offset any difference in conditions caused by increased governmental restrictions, this by no means compels the conclusion that the correct depreciation rate, a variable factor, is necessarily 2½% for ships lost during both wars.

The record plainly shows that when all of the factors had been considered the commissioner made an ultimate finding of value which is adequately supported by the evidence as a whole, weighed by the accepted legal standards. That is all we can now decide though it would, as we are told, be desirable to set some more certain precedent for other cases. If by that it is meant that we should lay down a definite formula of fixed application, it would be idle to make the attempt, for just as one ship differs from another in kind, condition, and availability for use so will there be variables which prevent the application of any rule of thumb. Each valuation that is contested will have to be reviewed on the merits of the particular case.

### Loss of Profits.

It was stipulated that, had the "Petar" completed her voyage, the profits thereon under the charter would have been $950.52 and, had she completed the charter under which she was then being operated, her owners would have made a profit of $12,746.28. The libellant contends that the second of these items is recoverable and, if not, certainly the first is. But it is well settled that the prospective profits of a charter party not entered upon at the time of the loss are not recoverable. The Amiable Nancy, 3 Wheat. 546, 4 L.Ed. 456; The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053. And we think there is no difference between profits under a charter already entered upon and under one not yet begun. Gans S. S. Line v. Wilhelmsen, 2 Cir., 275 F. 254, 265, certiorari denied sub nom. Barber & Co. v. Wilhelmsen, 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419; The Hamilton, D.C.E.D.N.Y., 95 F. 844, 845. Nor is there any distinction between profits that might have been made under the charter during that part of the charter time that would have been consumed by the particular voyage and those which might have been made during the whole remainder of the charter time. The fair value of the ship at the time of loss represents the amount of the recoverable damages unenhanced by loss of the value of her future use. The Hamilton, supra. This amount enures to the benefit of the owner and comprises his compensation for the loss "except for pending freight or for charter hire, which is in the nature of freight." [5] The Menominee, D.C.E.D.N.Y., 125 F. 530, 535. And nothing here falls within that exception.

### The Repatriation Expenses.

The "Petar's" owners were liable under a contract with a union which was acting in behalf of the "Petar's" crew, to pay the expenses of their repatriation, including transportation, maintenance, and interim wages, and it did so. The libellant claimed, and still claims, that two-thirds of the expenses thus incurred are recoverable from the respondent. It is not, and in the light of Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290,[6] could not successfully be argued that the respondent's liability arises from any contractual relationship of owner to crew which was dischargeable at the cost of the third party tort feasor. Instead, since the "Petar" was concededly at fault, it is argued that the liability flows from the right of one tort feasor to seek contribution from another on account of damages paid for the wrong. Erie R. Co. v. Erie & Western Transportation Co., 204 U.S. 220, 27 S.Ct. 246, 51 L.Ed. 450.

The libellant, being in this respect as in all others on this appeal, a suitor in the place and stead of the "Petar's" owners, must show as a condition precedent to the establishment of his right to contribution that they were jointly liable with the United States for the expenses in question. Though the "Petar" was a Yugoslavian ship sunk on the high seas, the district court would have had jurisdiction of tort suits by members of her crews against her owners. The Prahova, D.C.S.D.Cal., 38 F.Supp. 418. Cf. The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152. But whatever the tort liabili-

---

[5] Respondent has agreed to pay the cargo owner for the freight the latter was required to pay the charterer lost or not lost.

[6] See also The Federal No. 2, 2 Cir., 21 F.2d 313.

744

ty of a foreign owner of a foreign ship may be to its crew depends upon the law of the country whose flag the ship flies. Radovcic v. The Princ Pavle, D.C.S.D.N. Y., 45 F.Supp. 15; The Petter Lassen, D.C.N.D.Cal., 29 F.Supp. 938. Cf. Bonsalem v. Byron S. S. Corp., 2 Cir., 50 F.2d 114; The Hanna Neilsen, 2 Cir., 273 F. 171, petition dismissed sub nom. Tolo v. Steamship Hannah Neilson, 257 U.S. 651, 42 S.Ct. 53, 66 L.Ed. 417, certiorari denied 257 U.S. 653, 42 S.Ct. 93,.66 L.Ed. 418; Rainey v. New York & P. S. S. Co., 9 Cir., 216 F. 449, L.R.A.1916A, 1149, certiorari denied sub nom. Rainey v. W. R. Grace & Co., 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433. See also A. L. I., Restatement of Conflict of Laws (1934) Secs. 406, 408, 410. Likewise, the measure of damages is governed by that law. Cf. The Eagle Point, 3 Cir., 142 F. 453, certiorari denied sub nom. Liverpool, Brazil & River Plate Steam Navigation Co. v. The Steamship Eagle Point, 201 U.S. 644, 26 S.Ct. 760, 50 L.Ed. 902. The burden to prove foreign law is upon this libellant. Bonsalem v. Byron S. S. Co., supra; The Hanna Neilsen, supra; The Ubbergen, D.C.E.D.N.Y., 30 F.2d 951.

There is no evidence of the applicable Yugoslavian law in the record. However it might be in respect to British maritime law,[7] we cannot assume that the law of Yugoslavia, a civil law country and not even a great maritime power, is the same in respect to the measure of damages as that of the United States. Cuba R. Co. v. Crosby, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274, 38 L.R.A.,N.S., 40; Bonsalem v. Byron S. S. Co., supra. Consequently, it is immaterial whether the owners would be liable in tort under United States law for the payment of the expenses they were bound to pay under their contract. There being no proof that the owners were liable under Yugoslavian law, the denial of contribution in this case was correct, regardless of whether the respondent would be liable to the crew members themselves, a question which we do not decide.

Decree affirmed.

[7] Compare The Scotland, 105 U.S. 24, 29, 26 L.Ed. 1001, with The Hanna Neilsen, supra, 273 F. at 173.