**DE LA RAMA STEAMSHIP COMPANY, Inc. v. UNITED STATES.**

United States District Court
S. D. New York.

July 27, 1950.

See, also, 66 F.Supp. 909.

Burlingham, Veeder, Clark & Hupper, New York City, Proctors for libelant, Norman M. Barron, Hervey C. Allen, Jr., Roscoe H. Hupper, all of New York City, of counsel.

Irving H. Saypol, United States Attorney for the Southern District of New York, New York City, Proctor for respondent, Benjamin H. Berman, Department of Justice, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Upon libelant's motion, the above entitled cause was referred on October 4, 1948 by the Hon. John C. Knox, Senior Judge of this Court to a Commissioner to determine in advance of trial of any other issue in accordance with the applicable principles of law, the issue of the just compensation for the loss of the steamship Dona Aurora, which the libelant, if hereafter granted a final decree herein, shall be entitled to recover (less all payments on account heretofore made) in respect of the total loss of said steamship, and to report the same to the Court.

The Commissioner duly filed his report on March 23, 1950 and both parties have filed exceptions to the report.

The United States of America excepts to the report because it determined:

(1) Just compensation for the motor vessel Dona Aurora in the sum of $2,100,000 instead of $1,000,000;

(2) That the respondent was obligated to pay the libelant a value of the motor vessel Dona Aurora as of April, 1, 1942, a date prior to the date of the requisition of the use of the said vessel by the United States, instead of the value of said vessel on December 25, 1942, the date on which the vessel was lost;

(3) That the transactions between the United States Maritime Commission relating to the sales of 18 Type C-1B vessels referred to in Respondent's Exhibits 21a to 21r inclusive, did not constitute a market upon which to base the value of the motor vessel Dona Aurora:

(4) Just compensation for the motor vessel Dona Aurora in a sum in excess of the sum of $1,960,000 claimed by the libelant in Respondent's Exhibit 4 to constitute the fair value of the vessel.

The report is further excepted to because:

(5) It did not give any consideration to the original cost of $904,360 paid by the libelant for the construction of the motor vessel Dona Aurora:

(6) It failed to give any consideration to the fact that between May 19, 1942, the date on which the Administrator, War Shipping Administration gave notice to the libelant of the requisition of the use of said vessel by said Administrator, and December 25, 1942, the date of the loss of the motor vessel Dona Aurora, said vessel was under requisition for use by said Administrator, War Shipping Administration;

(7) It failed to properly take into account the depressing effect on the value of the motor vessel Dona Aurora by reason of Government restrictions on her use, earnings and transfer;

(8) It determined that the domestic reconstruction cost on a multiple ship basis less depreciation offered the most nearly reliable guide for determining valuation of a vessel during the year 1942;

(9) It determined that the domestic cost of reconstruction of the motor vessel Dona Aurora was the cost of reconstruction to be considered;

(10) It failed to give any consideration to the estimates of libelant's witnesses that the cost of reproducing the motor vessel Dona Aurora in the United States in October of 1939, the date on which the construction of said vessel was completed in Italy, was approximately 100% in excess of the cost of constructing said vessel in Italy as of October, 1939;

(11) It gave consideration to various insurance valuations placed on the motor vessel Dona Aurora and her sister ships by the libelant, which valuations were not supported by appraisals for insurance purposes;

(12) It held that libelant should recover as just compensation for the motor vessel Dona Aurora the full value of the vessel as of the time and place of her delivery to the Government, regardless of the amount by which that value was enhanced by the causes necessitating her taking;

(13) It failed to find the sum by which the Dona Aurora's value at the time of delivery to the Government or loss was enhanced by the Government's need for vessels in the prosecution of the war which necessitated the requisitioning of many of them and failed to reduce the amount awarded to libelant by the amount of such enhancement.

The libelant excepts to the report:

(1) Because the Commissioner found that the sum which in all probability the Dona Aurora would have brought at a voluntary sale on April 1, 1942 was $2,100,000 only, and failed to find that said sum was substantially in excess of $2,100,000.

(2) Because the Commissioner found that the fair market value of the Dona Aurora on December 25, 1942 amounted to the sum of $2,082,000 only, and failed to find that the fair market value of said vessel on said date was substantially in excess of $2,082,000.

(3) Because the Commissioner, in computing the sound depreciated value of the Dona Aurora on April 1, 1942 and December 25, 1942 applied an excessive depreciation rate of 3⅓% progressive, and failed to apply a depreciation rate of 2½% progressive.

(4) Because the Commissioner failed to find that libelant, as a part of just compensation for the loss of the Dona Aurora, is entitled to compensation for delay in payment measured by interest on the award herein at the rate of 6% per annum from the date of said vessel's loss, December 25, 1942, but on the contrary found that the Suits in Admiralty Act limits the libelant to interest on any award to the rate of 4% per annum from the date of filing of the libel herein on December 22, 1944.

(5) Because the Commissioner erred in admitting in evidence Respondent's Exhibit 19 for Identification purporting to be a certificate issued by the Assistant Secretary of the United States Maritime Commission to the effect that there was never any "determination" of just compensation made by the War Shipping Administration or the United States Maritime Commission for the Dona Aurora, which exhibit was not competent, relevant or material as to any issue before the Commissioner.

*Facts Generally*

Libelant is a Philippine corporation. The Dona Aurora and two sister ships were built for libelant as owner at Trieste, Italy, pursuant to a contract dated March 16, 1938. The total contract price for the Dona Aurora was $904,360 and the ship was delivered to the libelant on October 4, 1939.

The principal characteristics and register dimensions of the ship were as follows: Length overall, 439.4 feet; length between perpendiculars, 413.3 feet; breadth, 57.7 feet; depth, 37 feet; summer draft 26 feet 5¾ inches with shelter deck closed and corresponding freeboard of 10 feet 9½ inches; certified dead-weight capacity 8920 tons; bale cubic capacity 445,000 cubic feet; certified loaded speed 14.2 knots; propelled by Sulzer diesel engine of 5200 brake horsepower. She had five holds, five hatches, two decks (with a third deck in No. 1 compartment), two masts, four kingposts, electric winches, transverse framing and riveted construction. In addition to her original equipment a new gyroscopic compass was installed in September, 1941 at a cost to libelant of $18,363.

The Dona Aurora was a cargo vessel and had been built under supervision of Lloyd's surveyors and classified 100A-1 (Maltese Cross), Lloyd's highest classification. The libelant registered the Dona Aurora at Iloilo, Philippines, and placed the vessel, flying the American and Philippine flags, in its regular service between ports in the United States and the Philippine Islands and Far East. Prior to April, 1942, when the vessel entered the wartime service of the respondent, the Dona Aurora had made six or seven round voyages, and during that period had been maintained in first class condition.

The vessel was chartered for one year by the War Shipping Administration by a time charter executed on April 24, 1942 effective as of March 27, 1942. On May 20, 1942 the War Shipping Administration informed the libelant that it was requisitioning the Dona Aurora as of the date of her then present voyage. A requisition time charter was eventually executed between the libelant and the War Shipping Administration by agreement designated Contract No. WSA-3147-R effective as of April 1, 1942.

While in the Government's service the Dona Aurora suffered minor damage amounting to $18,000 in June and October of 1942, which damage was of a marine character at the owner's risk rather than at the Government's risk. See Requisition Charter, Part II, Clauses 1 and 20. The vessel was torpedoed in the Caribbean area on December 25, 1942 and was a total loss.

Libelant has brought suit against the United States to recover the war risk insurance valuation of the Dona Aurora pursuant to Title 46 U.S.C.A. § 1128d (repealed July 25, 1947). The requisition charter as amended (Contract No. WSA 3147-R, addendum No. 1) executed on June 2, 1944, effective April 1, 1942, provided in Part I:

"E. War Risk Insurance Valuation:
* * * * * *

"Option II.—Just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended [46 U.S.C.A. § 1242], for any loss or damage due to the operation of a risk as-sumed by the Charterer under the terms of this Charter to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage."

As previously stated, the question of "just compensation" for loss of the Dona Aurora was referred to the Commissioner for determination in advance of the trial of this suit. The Commissioner found that the Dona Aurora would have brought $2,100,000 at a voluntary sale on April 1, 1942 and $2,082,000 on December 25, 1942. Since the respondent has paid the libelant $1,000,000 with respect to the loss of the vessel without prejudice to its rights based on the eventual outcome of the proceeding, the Commissioner recommended that the libelant, if granted a final decree in this suit, shall be entitled to recover $1,100,000., the balance of the principal remaining unpaid,—the valuation as of April 1, 1942 having been chosen by the Commissioner as being appropriate—plus interest on unpaid principal from the date of filing of the libel. The factors which determined the Commissioner's valuation and recommendation will be considered below in connection with the consideration of the respective exceptions to the Commissioner's report.

*Valuation*

As an introduction to the question of valuation, the Court will reiterate several oft-repeated but fundamental principles.

At the outset, it must be remembered that the findings of the Commissioner, to the extent that they are findings of fact, are entitled to great weight and are to be given effect unless clearly erroneous. Ozanic v. United States (The Petar), 2 Cir., 1948, 165 F.2d 738; Admiralty Rule 43½, 28 U.S.C.A. ("The report of the Commissioner * * * shall be treated as presumptively correct * * *"); The Alaskan (American-Hawaiian S. S. Co. v. United States), D.C.S.D.N.Y.1949, 85 F. Supp. 815. And as the Supreme Court stated in the case of United States v. Toronto, Hamilton & Buffalo Navigation Co., 1949, 338 U.S. 396, 70 S.Ct. 217: "Perhaps no warning has been more [often] repeated than that the determination of

248

value cannot be reduced to inexorable rules." 338 U.S. at page 402, 70 S.Ct. at page 221.

Mr. Justice Frankfurter, in a concurring decision in that case, stated: "It is this Court's duty to lay down standards for application by the lower courts. But since we are concerned with ascertainment of rather elusive values, those whose primary duty it is to make these estimates ought not to be cramped by rules that are too rigid and too artificial. If * * * the questions presented to this Court in a particular case really turn, as they do here, on the relevance of data and the reasonableness of the inferences drawn from them in arriving at just compensation, the training and experience of the fact-finders become important." 338 U.S. at page 407, 70 S.Ct. at page 224.

This Court will keep these statements in mind in considering the exceptions to the Commissioner's report.

■ In the usual case, just compensation is measured by market value where a market is shown to exist. Standard Oil Co. v. Southern Pacific Co., 1925, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; The Petar, supra. The question that usually arises in valuation cases is whether or not a "market" exists. The "market" that is referred to is a "free and open market", that is, a market in the ordinary course of business determined by sellers who are willing to sell and buyers who are willing to buy. Because of the importance of the question of a "market" in this suit, several definitions of "market value" or "market price" are appropriate.

In the case of Brooks-Scanlon Corp. v. United States, 1924, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934 the Court defined market value as: " * * * the sum which, considering all the circumstances—uncertainties of * * * war and the rest—probably could have been obtained for an assignment of the contract and claimant's rights thereunder; that is, the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy." 265 U.S. at pages 123–124, 44 S.Ct. at page 475.

In Weed v. Lyons Petroleum Co., D.C. Del.1923, 294 F. 725, 734, affirmed on the opinion below, 3 Cir., 1924, 300 F. 1005 the court said: " * * * market price means the fair value as between one who desires, but is not compelled, to buy, and one who is willing, but not compelled, to sell, not what could be obtained for like property under peculiar circumstances when a price greater or less than its fair price could be obtained, nor a speculative value, nor a price obtained in a manipulated or stimulated market, nor a value obtained from the necessity of the seller to sell or the purchaser to buy, but its value at a sale which a prudent owner would make, if he had the power of election as to time and terms (citing cases). In order for the market price rule truly to reflect and measure plaintiff's loss, obviously there must be an available market."

■ Thus it can be seen that the market to be considered in ascertaining market value is a *free market,* if such exists, at the time and place of taking, even though the market itself may be considered abnormal due to the state of the economy at the time, either because of war or depression or other factors. See Brooks-Scanlon Corp. v. United States, supra.

(a) *Market if any in Instant case.*

The Commissioner held that the date of taking, April 1, 1942, is the proper date as of which the value of the Dona Aurora should be fixed. However, because of the "unsettled condition of the established law" (Report, p. 15) the Commissioner found values for the vessel both on the date of taking, April 1, 1942 and on the date of loss, December 25, 1942. Respondent excepts to the Commissioner's choice of a valuation date. (Exception No. 2). Furthermore, respondent claims that the vessel was requisitioned on May 19, 1942, the date that a telegram was sent by the War Shipping Administration to the libelant stating that the ship was requisitioned.

The effective date of the requisition as evidenced by the requisition charter agreement, as amended, was April 1, 1942, and this sufficiently supports the Commissioner's finding that April 1 was the requisition

date. In any event, it is apparent from the Commissioner's report (p. 24) that the choice of a requisition date between April 1 and May 19 is immaterial since he found that the value of the vessel remained constant between April 1, 1942 and December 25, 1942 because the amount of depreciation during that period was offset by the rising cost of materials. The only difference in the valuations on April 1 and December 25 is attributable to the estimated cost of repairs necessary to keep the Dona Aurora in class on the date of loss, this estimate being in the sum of $18,000 and arising out of damage sustained during June and October of 1942, which would not affect valuations in April or May.

The Commissioner's choice of the date of requisition as the valuation date was based on the "holding" to that effect in The Alaskan, supra, 85 F.Supp. at page 819. The Court in that case looked to the ordinary commercial insurance practice which fixed the amount of interest insured as the value of the vessel at the inception of the risk. A close examination of the Alaskan case reveals that the Commissioner in that case actually found that it made no difference whether the date of requisition or the date of loss was used since the value of the vessel was the same on both dates, therefore the Court's "holding" was not necessary for a decision and therefore mere dictum.

On the other hand, as the Commissioner stated, (Report p. 15) the Court of Appeals for the First Circuit in United States v. Eastern S. S. Lines (The George Washington), 1949, 171 F.2d 589, and the Court of Appeals for the Third Circuit in The Virginia (National Bulk Carriers v. United States), 1948, 169 F.2d 943, have both adopted the date of loss as the valuation date. True, as the Commissioner states, there does not seem to have been any issue raised in either of those cases as to the proper valuation date, yet the choice of such date was essential to the decisions in both cases.

This Court believes that the date of *loss* is the proper date for valuation in this case. Although the Commissioner accepted The Alaskan rationale, he stated that "although this suit is based on an insurance policy, its primary purpose is to effect a recovery for just compensation to the libellant for the taking of his vessel." (Report p. 15). This language would seem to lead to the opposite conclusion,—that the date of loss should be adopted as the proper valuation date. This is not an ordinary suit on a commercial insurance policy. While the charter provision sued on is labeled "War Risk Insurance Valuation", the extent of recovery is limited to "just compensation". When the Dona Aurora was requisitioned in April, 1942, the libelant was paid a fair rate as compensation for the use of the vessel. While the War Shipping Administration used the vessel, the responsibility for war risk insurance was upon the WSA. However, the shipowner was responsible for ordinary marine damage. There were two items of damage totaling $18,000 between the date of requisition and the date of loss for which the shipowner had the duty of repair. If the date of requisition is taken as the valuation date, this $18,000 damage is effectively shifted onto the Government.

While the sum is relatively minor in this case, the impropriety of holding that the date of requisition is the valuation date can be seen from the following example: A ship operated under a requisition charter and worth $2,000,000 on the date of requisition is damaged due to an ordinary marine risk and reduced in value to $100,000. The shipowner then owns a ship worth $100,000. and if the war ended the day after the marine injury, the owner would merely get back his vessel worth that amount. However, while the damaged ship is heading towards a repair yard it is torpedoed and sunk. It seems incredible to this Court that by the "fortuitous" circumstance of a torpedo attack, that the marine loss in the hypothetical case of $1,900,000 should fall upon the Government rather than upon the shipowner. It would appear that the proper theory is that when a ship is requisitioned for use, the Government pays "just compensation" for the use; if the ship is sunk or otherwise reduced to a total loss due to a war risk while in such use, the date of loss should be considered as the date on which the Government finally and completely took the ship for all purposes rather than just for use, and that it must pay "just compen-

sation" as of that date. The Rules for Determination of Just Compensation promulgated by the Advisory Board to the War Shipping Administration, 1943 A.M.C. 1443, are cited by both parties in support of their respective positions on this point.

Rules 1 and 4 of these Rules speak of value at the time of taking, but the Court believes that this is meant to apply only to an outright and complete requisition of a ship. On the other hand, Rule 7 states that: "In the event of loss due to a risk assumed by the United States in connection with the use of any vessel where no valuation or other mode of compensation has been agreed to, just compensation should be determined on the basis of value on the date of such loss."

The Court believes this Rule is applicable in the instant case. The libelant alleges that a mode of compensation was agreed to, i.e. commercial insurance valuation, and therefore Rule 7 is not apropos. The mere placing of the provisions as to just compensation under the form heading of "War Risk Insurance Valuation" does not, in the opinion of this Court, specify a "valuation or other mode of compensation * * * agreed to" within the meaning of Rule 7.

Section 902 of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242, which must be looked to in determining just compensation under the requisition charter agreement, provides *inter alia* that: "In the event of loss or damage to such (chartered) property, due to operation of a risk assumed by the United States under the terms of a charter prescribed in this subsection, but no valuation of such vessel or other property or mode of compensation has been agreed to, the United States shall pay just compensation for *such loss or damage*, to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage." (Emphasis added).

█ The Court believes that this language supports the aforementioned view that just compensation need only be paid for the *loss* sustained by the shipowner, which would be the value of the ship to him on the date of loss. Therefore this Court accepts December 25, 1942, the date of loss, as the proper valuation date for the Dona Aurora and sustains the second exception of the respondent to the Commissioner's report and reverses the Commissioner's finding as to the date of valuation.

█ The principle issue on the question of valuation, reflected in respondent's exceptions numbered 1 and 3, is whether the sale by the Maritime Commission of 18 type C-1B vessels comparable to the Dona Aurora in 1942 and 1943 constituted a market at that time upon which a valuation of the Dona Aurora could and should have been based. The parties are in agreement that these vessels were similar in type to the Dona Aurora. The sales were made by the Maritime Commission to American companies at an average price of $1,129,-000 per vessel under the authority of Title 46 U.S.C.A. §§ 1151–1153, 1156, and 1212. The Commissioner determined that since these vessels were sold subject to restrictions and under construction-subsidy agreements, they did not constitute a "market" in 1942. This Court is in full agreement with the Commissioner's finding.

The sales of the 18C-1B vessels were made through the aid of construction differential subsidies. Under the sections of Title 46 U.S.C.A. referred to above a citizen of the United States could apply for a construction differential subsidy to aid in the construction of a new vessel, which meant that the purchaser could obtain the vessel at approximately 50% of the cost to the Maritime Commission. Every applicant for a subsidy had to agree to various restrictions upon which granting of such subsidies was conditioned, such as: a restriction on sale of the vessel for 20 years; limitation on the use of the vessel to a specific foreign trade route; and limitation on the amount of compensation to be paid to him in the event of requisition by the Government.

These sales, the Government alleges, constituted a *free* market which would put the Dona Aurora's valuation at approximately $1,000,000. It is difficult to comprehend how the Government can advance such a contention. Surely a *willing* seller would not sell a new vessel at 50% of the cost

to him. These sales were merely conditional sales under a multiplicity of stringent conditions. A "free market" is one which is available to a willing purchaser. It has not been shown that the citizenship of the libelant corporation would even have permitted it to apply for a subsidized vessel. The subsidy system was merely a "stimulated market", see quotation from Weed v. Lyons Petroleum Co., supra; the Government was selling ships at a considerable loss in order to stimulate American commerce. If the Government had been *giving* ships away to a limited group of American shipping companies for use in the foreign trade subject to restrictions as aforestated, which would not have been an unlikely procedure, surely it could not come in now and say that similar type requisitioned ships (not so given or limited in use) had no value based on an established "market".

The Government relies on the case of The Virginia, supra, for the proposition that the Maritime Commission sales of subsidized vessels constituted a market. In the Virginia case, the vessel in question was compared to T-2 tankers sold by the Government (not under construction differential subsidies) for about $3,000,000, approximately their full construction cost. Though these sales were regulated and involved cumbersome procedure between the purchaser and the Maritime Commission, the court in that case agreed with the Commissioner's finding that the T-2 tanker sales constituted a market for comparison; this was based on the conclusion that: " 'Despite all the legal smoke screen thus set up * * * the transaction amounted to nothing more nor less than a sale of the vessel to the purchaser as of the date of the delivery of the vessel * * * it can be reasonably said, also, that these sales were entered into by a party willing to sell and a party willing to buy.' " 169 F.2d at page 947. The sale price of $3,000,000 was used as a yardstick in that case. A different situation is applicable here. The sales of the C-1B vessels in this case were for approximately half the construction cost and cannot be used as a yardstick of value. The Virginia case does not support the Government's position that a free market existed at approximately $1,000,000 for vessels comparable to the Dona Aurora.

It should be noted that the Maritime Commission sold 3 C-1B vessels in August and September of 1941, and in January of 1942 without subsidy restrictions at full construction cost to the Maritime Commission. Two of these vessels were sold for $2,247,054.61 each, and the third for $2,217,216.88. The Commissioner found that these sales were insufficient in number to constitute a "market". He did find, however, that "the prices received by the Government for those vessels, subject to no trade restrictions, much more nearly approximated a market under the Virginia decision than the sales of the eighteen C-1Bs under construction-differential subsidies." (Report p. 12).

■ The Commissioner found, and appropriately so, in the opinion of this Court, that no "market" existed in accordance with which the value of the Dona Aurora in 1942 could be computed, and, in any event, that the sale of the 18 C-1B's did not constitute a market. Therefore respondent's exceptions 1 and 3 are overruled.

■ In the absence of such a market, the basis of valuation must be a composite one based on such factors as reconstruction cost less depreciation, the manner in which the vessel had been kept up, appraisals for insurance purposes, earning capacity, original cost where appropriate, extent of demand compared to supply, the amount of war risk insurance obtainable, restrictions to which ships were subject, and so forth. The Petar, D.C.S.D.N.Y.1946, 68 F.Supp. 296 (district court decision), and affirmance, supra; The Hisko (Almirante S. S. Corp. v. United States), 2 Cir., 1931, 54 F.2d 540; Standard Oil Co. v. Southern Pacific Co., supra; The Alaskan, supra.

The Rules for Determination of Just Compensation, supra, follow the above outlined principles.

Rule 3 of these Rules, 1943 A.M.C. 1444, provides that: "Where market value cannot be determined by sufficient sales, or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a

consideration of cost of construction, acquisition cost so far as relevant, improvement, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment as to value can be based. These matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

Respondent's exceptions numbered 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and libelant's exceptions 1 and 2 deal with the valuation found by the Commissioner in the absence of a "market value".

(b) *Valuation in Absence of Market. Factors*:

(1) *Isolated Comparable Sales.* The Commissioner found that the three C-1B sales in 1941 and 1942 almost approximated a market. These sales are a factor to be considered in determining the value of the Dona Aurora. The Supreme Court said in the case of United States v. Toronto, Hamilton & Buffalo Navigation Co., supra: "At times, however, peculiar circumstances may make it impossible to determine a 'market value.' There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is 'no market' for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. We simply must be wary that we give these sparse sales less weight than we accord 'market' price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer." 338 U.S. at page 402, 70 S.Ct. at page 221.

The sales of three C-1B vessels were close in time to the period in which the Dona Aurora was requisitioned, used and destroyed (cf. The Alaskan, supra), and furthermore were sales at the construc-tion cost without any allowance of profit to the Commission, thereby amounting in reality to a minimum valuation figure. They were properly considered by the Commissioner in connection with his valuation of the Dona Aurora.

(2) *Reconstruction Cost Less Depreciation.*

The prime factor used by the Commissioner in his valuation was the domestic reconstruction cost of the Dona Aurora on a multiple ship basis during 1942 less depreciation. Respondent's exceptions 8, 9 and 10 object to use of this factor or method. Reconstruction cost less depreciation has been accepted as the most reliable factor in computing the value of a requisitioned vessel in the absence of a market. The George Washington, supra; The Petar, supra; The William C. McTarnahan (National Bulk Carriers v. United States), D.C.Del.1949, 82 F.Supp. 495; The Hisko supra; Standard Oil Co. v. Southern Pacific Co., supra; The Alaskan, supra. Indeed, this value has often been deemed an indication of the *minimum* value. The Petar, supra; The Hisko, supra. Furthermore, it is the market price or reproduction cost at the *time* and *place* of taking (in this case the date of loss) which must be used in determining just compensation. United States v. Toronto, Hamilton & Buffalo Navigation Co., supra; The Petar, supra. Especially is this true if the vessel would have been sold here if it had been sold anywhere. The Petar, supra, 165 F.2d at page 741. The reproduction cost on a multiple ship basis was accepted in The Petar, supra, as proper since the only ships being built in this country in 1942 were built on that basis. True, reproduction cost less depreciation has often been said not to be the "sole guide", but as will be seen the Commissioner did not accept this as the sole guide, but only as a factor and properly as the most important factor.

The respondent contends that the reproduction cost in Italy in 1942 should have been considered since the ship was built in Italy. It was most unlikely that a purchaser could have had his vessel constructed in Italy during the wartime period of 1942, and there is no evidence in the

record as to the reproduction cost in Italy at that time. Respondent in exception 10 contends that the Commissioner should have considered that the reproduction cost of the Dona Aurora in the United States in October of 1939, the date the vessel was finished, was approximately 100% in excess of the cost of constructing the vessel in Italy on that date. Even if this were true, it would be immaterial since the reproduction cost on the valuation date is the controlling value. Furthermore respondent's contention is in reality predicated on the March, 1938 *contract price* of the Dona Aurora rather than the 1939 reproduction cost, and there is no evidence as to that cost. The ship was in the United States in 1942 and was used in the United States to the Far East trade, and if sold would most likely have been sold here. Furthermore, the ship was almost new and not obsolete so that it could not possibly be said that reconstruction cost is inapplicable as no person would reconstruct the ship. See The George Washington, supra, 171 F.2d at page 592. Therefore respondent's exceptions numbered 8, 9 and 10 are hereby overruled.

(3) *Original Cost.*

 Where market value or prices at the time of valuation have changed considerably and in no way reflect the original cost, that cost is disregarded by the courts and termed the "false standard of the past". United States v. Toronto, Hamilton & Buffalo Navigation Co., supra, 338 U. S. at page 403, 70 S.Ct. at page 221; The Petar, supra; Standard Oil Co. v. Southern Pacific Co., supra. The Commissioner gave due consideration to the original cost in this case and determined that "such drastic changes had taken place in the few months between the time of the contract and July 1940, (at which time Italy had formally entered the war) as to make the original cost of construction a matter of comparative unimportance in determining the value of the Dona Aurora and as the war progressed, conditions as to markets, availability of ships and supplies changed even more." (Report p. 22). In the light of these changed conditions there is no merit to respondent's contention that

original cost is an important factor in this valuation because the ship was only three years old when sunk. Accordingly, respondent's exception No. 5 to what it alleges to be a failure to give any consideration to the original cost of $904,360 paid by the libelant for the construction of the Dona Aurora, is overruled.

(4) *Effect of Government Controls.*

Respondent's exception 6 alleges that the Commissioner failed to consider that the Dona Aurora was under requisition for use by the War Shipping Administration on the valuation date. This factor by itself is immaterial, for "just compensation" must be determined by value in a free market. The ship's value to the libelant based on market prices is to be determined, not its value to the War Shipping Administration. Exception 6 is overruled.

Respondent's exception 7 contends that the Commissioner failed to properly consider the depressing effect of Government restrictions on the use, earnings and transfer of the Dona Aurora.

A general principle that is applicable in ruling on this and other exceptions as to the weight given by the Commissioner to certain factors and evidence is found in the Petar case, supra, 165 F.2d at page 742. In considering a similar exception to the weight given by the Commissioner to Governmental restrictions, the Court said: "His (the Commissioner's) report shows, however, that these matters were considered. And we cannot examine [into] his thought processes."

So, too, in this case did the Commissioner consider the effect of Governmental restrictions. On page 24 of his report he said: "Giving consideration to the foregoing figures (as to reproduction cost less depreciation), but also bearing in mind the general characteristics of the Dona Aurora, her earnings prior to requisition, the various insurance valuations placed on the vessel as well as on her sister ships, and all the relevant facts before him on this matter, including the uncertainties of the pending war and the *depressive effects of Government controls on shipping*, it is your Commissioner's finding that the sum which in all probability the Dona Aurora would

have brought at a voluntary sale on April 1, 1942, was $2,100,000. On the basis of the same considerations * * * the fair market value of the Dona Aurora on December 25, 1942, amounted to the sum of $2,082,000." (Emphasis added).

The depreciated cost of reproducing the vessel on December 25, 1942 was found by the Commissioner to be $2,240,-171. If we then analyze the factors enumerated by the Commissioner in the above quotation, it can be seen that the Commissioner gave considerable effect to the depressing effects of Governmental controls and the uncertainties of the war, for the other factors mentioned would probably tend to raise the valuation of the ship—the ship was in excellent condition and its earnings prior to requisition were extremely good; furthermore the insurance valuations placed on the ship were high. Libelant contends that the Commissioner considered the effect of wartime restrictions *twice*—the second time being in connection with the determination of the rate of depreciation. This is correct and will be further discussed in connection with the consideration of libelant's exception addressed to the rate of depreciation, *infra*. The Commissioner considered the effect of war time restrictions—the Court cannot further examine the Commissioner's thought processes. Respondent's exception 7 is overruled.

(5) *Insurance Valuations.*

Respondent excepts to the Commissioner's consideration of insurance valuations which it alleges are unsupported by insurance appraisals and therefore irrelevant (Exception 11). The Commissioner in his report specifically referred to an insurance appraisal made for a· sister ship of the Dona Aurora in January, 1942 in the sum of $1,960,000. (Report p. 21). This certainly is relevant in connection with a valuation of the Dona Aurora. Furthermore, while it has been said that the amount of insurance placed on a ship is irrelevant to a valuation, see e.g., The Petar, supra, 165 F.2d at page 742, the Court upon examining the cases has found that this has been held to be true where insurance was placed on vessels for but a small·portion of their actual worth. The Court does believe that insurance is relevant as an indication in the majority of cases of a *minimum* valuation. As Judge Leibell said in the district court decision in the Petar case, supra, quoting from Union Pacific R. Co. v. Lucas, 8 Cir., 1905, 136 F. 374, 377: "The theory and practice of insurers and insured is to make the limit of insurance much less than the value of the property, while owners are permitted to procure insurance in amounts far below this limit." [68 F.Supp. 299.]

As the Court of Claims said in the Toronto, Hamilton & Buffalo Nav. Co. v. United States, Ct.Cl.1950, 88 F.Supp. 1016: "Since the Maitland No. 1 was valued for insurance purposes at $100,000, and since there is nothing in the record to indicate anything fictional or fraudulent concerning this amount, we feel justified in proceeding upon the theory that a fair value to represent just compensation *could not be any less than that amount*." 88 F. Supp. at page 1018, (emphasis added). Cf. The Hisko, supra.

Hence this Court believes that while a vessel may be underinsured, it is unlikely that it would or could be over-insured and therefore insurance valuations have some relevance on the question of a minimum valuation. In this connection it must be noted that the Dona Aurora was valued for insurance at $1,500,000. at the time she was delivered to the libelant in 1939, which would indicate that even at that early date costs had so increased as to raise the value of the vessel considerably. Subsequently her insurance was raised to $2,000,000. In the superseded charter of March, 1942, the War Shipping Administration placed a war risk insurance valuation on the vessel of $1,500,000 which was protested by libelant as being too low. (Report pp. 20–21.) Note also that the Court of Appeals in the Petar, supra, 165 F.2d at page 742, said that the amount of insurance obtainable in a war period is something that a prospective purchaser would consider, and therefore relevant in valuing a ship. These figures, both insurance amounts and appraisals, support the valuation of the Dona Aurora in the neighborhood of $2,000,000

rather than around $1,000,000 as contended by respondent. The Commissioner did not err in his consideration of insurance valuations. Respondent's exception No. 11 is overruled.

(6) *Enhancement.*

Respondent's exceptions 12 and 13 claim that the Commissioner should have reduced the amount awarded to the libelant by sums representing enhancement due to the Government's need for vessels in the prosecution of the war and due to the causes necessitating the taking of the vessel.

Rule 4 of the Rules for Just Compensation promulgated by the Advisory Board, supra, p. 1444, provides that: "From the value at the time of taking, there should be deducted any enhancement due: to the government's need of vessels which has necessitated the taking, to the previous taking of vessels of similar type, or to a prospective taking, reasonably probable, whether such need, taking, or prospect occurred before or after the declaration of the National Emergency of May 27, 1941. Enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. * * *"

The provision of the requisition charter upon which suit is brought states that just compensation is to be determined in accordance with Section 902 of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242, which provides in part: "When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use."

▆ It can be seen that in determining just compensation for a vessel, the fact that the Government may need the vessel for prosecution of the war should not be permitted to act as an inflationary force on the value of the vessel. However, the Government is not to be placed in a more advantageous position than other purchasers—it takes the vessel subject to the enhancement arising out of the high prices in the war-time economy. The Government stands in the position of a private operator buying the vessel for his own use. The Virginia, supra, 169 F.2d at page 949; Wilson Line v. United States, 1948, 78 F. Supp. 821, 829, 111 Ct.Cl. 764; The Alaskan, D.C., 92 F.Supp. 785.

▆ There was no need for the Commissioner to reduce the amount of his award by any "forbidden" enhancement, for he specifically stated and found "that no part of the foregoing amount computed by him represents enhancement by reason of causes necessitating the taking or use of the vessel by the United States of America." (Report p. 24). Respondent's exceptions 12 and 13 are overruled.

(7) *Rate of Depreciation.*

The Commissioner applied a $3\frac{1}{3}\%$ progressive rate of depreciation in arriving at the reproduction cost less depreciation figure of $2,240,171. for December 25, 1942. The reproduction cost was obtained by averaging the estimates made by both respondent's and libelant's witnesses. The reproduction cost estimates were substantially in accord and there is no real dispute as to the average figure accepted by the Commissioner.

The libelant's witnesses used a depreciation rate of $2\frac{1}{2}\%$ progressive; one of those witnesses did not deduct any depreciation for the first year of the vessel's service under the belief that the ship appreciates during that year when she is broken in rather than depreciates. The respondent's witnesses adopted depreciation rates of 4% and 5%.

Supplementary Rule 4 to the Rules on Just Compensation, 1945 A.M.C. 1384 provides: "While reproduction costs shall be depreciated according to the age of the vessels, no fixed rate of depreciation can be stated; the amount of depreciation must be found by the Administrator in the light of approved expert opinion or other relevant evidence before him."

The rate of depreciation then is not a fixed figure—it varies with the circumstances in the individual case. The *minimum* figure found in any case has been $2\frac{1}{2}\%$

progressive; 5% usually represents a maximum figure. A rate of 2½% has been said to be most applicable during a war-time economy, see e.g. The William C. Mc-Tarnahan, supra; Standard Oil Co. v. Southern Pacific Co., supra; The Hisko, supra. Yet rates greater than 2½% have been used in reference to ships requisitioned during World War II, e.g. The George Washington, supra (5%); The Petar, supra (about 3⅓% progressive).

■ The Commissioner found 3⅓% progressive to be a fair rate. As a factor in this determination he mentioned the wartime restrictions which applied to all American ships in 1942. (Report p. 19). While it is true that the depressing effect of Governmental restrictions was generally considered by the Commissioner elsewhere in his evaluation of the Dona Aurora (see Report p. 24), it is possible that these wartime restrictions did have an effect on more than one valuation factor. See The Petar, supra, 165 F.2d at page 742. The Court cannot say that the Commissioner erred in accepting the relatively small (since progressive) rate of depreciation of 3⅓% rather than the 2½% contended for by the libelant. Libelant's exception No. 3, directed at the depreciation rate, is overruled.

(8) *Miscellaneous.*

■ Libelant's manager sent a letter on October 14, 1943 to the War Shipping Administration during negotiations for settlement of its claim, in which libelant demanded compensation in the sum of $1,-960,000 for the Dona Aurora based on the appraisal of her sister ship, the Dona Aniceta, made at that time. The War Shipping Administration did not see fit to act upon that letter or make any offer to the libelant. The respondent cannot be heard to say now that the figure in the letter is "binding" upon the libelant. If this were so, claims made before an administrative agency would never reflect a fair value sought, but rather the upper limit desired, and settlements would be seriously impeded. Respondent's exception 4, which objects to the Commissioner's valuation in excess of

the sum of $1,960,000 is therefore overruled.

■ It can be seen from the consideration of the foregoing exceptions that the Commissioner did take the proper factors into consideration in making his findings evaluating the Dona Aurora. He found the fair market value of the ship on December 25, 1942, the valuation date accepted by this Court, to be $2,082,000. The respondent says this award is excessive; the libelant that it is insufficient (Exceptions 1, 2). It is not for the Court to super-impose its judgment on that of the Commissioner where he applied the proper factors in evaluating and then say that the award should be a little more or a little less. As a fact finding by the Commissioner, the valuation must stand unless clearly erroneous. The award appears to be eminently fair and properly based on relevant valuation factors; therefore it is adopted by this Court and libelant's exceptions 1 and 2 overruled.

■ The Commissioner allowed interest on the award at the rate of 4% per annum from the date of the filing of the libel on December 22, 1944. Libelant in its exception No. 4 alleges that interest should have been allowed at the rate of 6% per annum from the date of the vessel's loss on December 25, 1942.

This suit has been brought both under Sec. 1128d of Title 46 U.S.C.A., as aforementioned, and under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.

Sec. 743 of Title 46 provides that: " * * * A decree against the United States * * * may include costs of suit, and when the decree is for a money judgment, interest at the rate of 4 per centum per annum until satisfied, or at any higher rate which shall be stipulated in any contract on which such decree shall be based. Interest shall run as ordered by the court * * *

Sec. 745 of Title 46 provides: " * * * That no interest shall be allowed on any claim prior to the time when suit on such claim is brought as authorized hereunder."

It has been held in several well-considered decisions that these Sections, which are

applicable to a suit such as this under Section 1128d of Title 46, require that interest be limited to 4% from the date of the filing of the libel. The Alaskan, supra; The Virginia, supra; The George Washington, supra. The case of The Virginia has an extensive discussion of the reasons for this decision, and this Court will not repeat those reasons but will adopt the rationale of that decision in limiting interest in this case. As has been said, "The provisions of the statute as to interest may seem harsh and not in accord with commercial practice; but a claimant can always preserve his claim for interest by bringing suit promptly * * * 'relief must be sought in Congress, not in the courts.'" The Alaskan, supra, 85 F.Supp. at page 819. Libelant's exception No. 4 is overruled.

Libelant's exception 5 questions the Commissioner's ruling in admitting into evidence a certificate offered to show that no determination of just compensation was ever made by the War Shipping Administration or the Maritime Commission. As libelant itself says (p. 5 of its brief) this exception is of minor importance. It is undisputed that no determination of just compensation was made, and hence admitting or excluding the questioned evidence is immaterial. Libelant's exception 5 is overruled.

Accordingly, all exceptions other than respondent's exception No. 2 have been overruled. The Commissioner's report is confirmed except that December 25, 1942 is chosen as the valuation date. The Commissioner's recommendations on the last page of his report as to the amounts libelant shall be entitled to recover if awarded a final decree herein are amended to conform with the value as of December 25, 1942.

The Commissioner devoted upward of 250 hours to the case. The record consists of 1067 pages of testimony and 110 exhibits. The Commissioner's fee is fixed at $7,500 plus $66.30 for his disbursements, payable now in accordance with Rule 26 of the Admiralty Rules of this District Court.

Settle order in accordance with this decision.