**DE LA RAMA S. S. CO., Inc. v.**
**UNITED STATES.**

United States District Court
S. D. New York.

June 27, 1951.

Burlingham, Veeder, Clark & Hupper, New York City, Norman M. Barron, Hervey C. Allen, Jr., and Roscoe H. Hupper, all of New York City, of counsel, for libelant.

Irving H. Saypol, U. S. Atty., New York City, Benjamin H. Berman, Department of Justice, New York City, of counsel, for respondent.

WEINFELD, District Judge.

Libellant was the owner of the motor vessel, the Dona Aurora, which had been requisitioned by the War Shipping Administration in April 1942. It was torpedoed and sunk on December 25th, 1942. This libel was filed thereafter upon a claim for war risk insurance pursuant to Title 46 U. S.C.A. § 1128d.

The amount which libellant is entitled to recover for the loss of the vessel, if awarded a final decree, has been fixed at $2,082,000 by an order of District Judge Irving R. Kaufman, following the rendition of a report by a Commissioner to whom the issue of damages had been referred in advance of trial. D.C., 92 F.Supp. 243. The remaining issues to be decided concern the right of libellant to recover.

The Government resists libellant's claim upon jurisdictional and other grounds. The facts are not in dispute, although the interpretations drawn therefrom are in conflict. They are to be considered against the background of the statutory authority under which the War Shipping Administration or its Administrator acted with respect to the Dona Aurora.

The Merchant Marine Act of 1936 set up the procedure for the acquisition of vessels by the Government when required by the national defense or during any national emergency. Upon appropriate proclamation by the President, the Maritime Commission was authorized to requisition or purchase any vessel and the owner was to be paid just compensation for the property or its use. Ch. 858, Title IX, § 902, 49 Stat. 2015, 46 U.S.C.A. § 1242. An amendment to the Act conferred authority upon the Commission to provide marine or war risk insurance on vessels so chartered or requisitioned. 54 Stat. 689–691, 57 Stat. 51, 46 U.S.C.A. §§ 1128–1128h.[1] Authority to char-

---

1. By Executive Order the functions and duties of the Maritime Commission were in part transferred to the War Shipping Administration under the direction of an Administrator who was vested with power to:

"1. * * *

"2. * * *

"a. Control the * * * charter, requisition, and use of all ocean vessels under the flag or control of the United States, * * *.

ter vessels on a "time charter" basis upon such terms and conditions as the Commission deemed necessary or desirable, including the issuance of insurance, was also granted by § 1273 of Title 50, U.S.C.A.Appendix.

On March 27th, 1942, the War Shipping Administration notified libellant by telegram that it desired to charter the Dona Aurora on a time charter basis. On March 30th, 1942, respondent issued its war risk insurance binder T. C. 1142 in the sum of $1,500,000 in the event of total loss of the vessel. On April 1st, 1942, the vessel was delivered by libellant to the War Shipping Administration, which acknowledged that such delivery was made under the terms of a time "charter to be executed later." In fact, this time charter was not executed and delivered to libellant until April 24th, 1942, effective "as of March 27th, 1942" and was for a period of about one year. War risk insurance valuation was also fixed thereunder at $1,500,000, the same as that set forth in the binder issued on March 30th, 1942, which binder was not delivered to libellant until May 9th, 1942.

On May 20th, 1942, libellant received from the War Shipping Administration notice of requisition of the Dona Aurora as follows:

"War Shipping Administration has previously chartered from you following vessels: Dona Aurora * * *.

"In order to carry out requisition program now in effect all of the above vessels are hereby requisitioned for use under time form charter * * *.

"Requisition charter in form set forth in Federal Register of May 16, 1942 together with rates and insurance valuations contained in General Order 8 and 9 published Federal Register May 16, 1942 will be tendered to you as soon as possible. Please advise immediately whether you desire to have these rates and valuations made effective as of time of delivery under current charter * * *."

Part II of the requisition charter form published in the Federal Register of May 16th, 1942, and referred to in the foregoing telegram, contained a provision which obligated the War Shipping Administration as charterer to provide and pay for war risk insurance (Clause 20).[2]

The published form also contained alternative measures of war risk insurance valuation, Options I and II. Option II provided for valuation equivalent to "Just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended, for any loss or damage due to the operation of a risk assumed by the Charterer under the terms of this Charter to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage."

Libellant replied to the War Shipping Administration's notification by telegram on June 15th, 1942, advising of its choice of rates. As to insurance valuation, it pointed

---

* * * * * * *
"c. Provide marine insurance and reinsurance against loss or damage by the risks of war as authorized by Title II of the Merchant Marine Act, 1936, as amended.
* * * * * * *
"3. The functions, duties, and powers conferred by law upon the United States Maritime Commission with respect to the * * * charter, insurance * * * and requisition of vessels, * * * under the Merchant Marine Act of 1936 as amended, 49 Stat. 1985, Public Law 101 Seventy-Seventh Congress, approved June 6, 1941, * * * are hereby transferred to the Administrator; * * *." Executive Order 9054 of February 7th, 1942, 7 F.R. 837, 50 U.S.C.A. Appendix, § 1295 note.

2. Clause 20: "Unless otherwise mutually arranged, at all times during the currency of this Charter the Charterer shall provide and pay for or assume: (i) insurance on the Vessel, under the terms and conditions of the full form of standard hull war risk policy of the War Shipping Administration, * * * insured for and valued at the amount set forth in Part I which insurance shall be made payable to the persons entitled thereto; (ii) all war risk insurance, as required, * * * on the actual value of the Vessel's unused consumable stores * * *; and (iii) war risk protection and indemnity insurance, * * * including Owner's liabilities to officers and crew until repatriated."

out that the vessel—having been built after 1935—was excepted from the application of General Order No. 9 formula for fixing insurance valuations, Option I.[3] Thus, Option II was the only choice open to libellant.

Section 902 of the Merchant Marine Act of 1936 imposed on the War Shipping Administration the duty of transmitting "at the time of the taking or as soon thereafter as the exigencies of the situation may permit, * * * a charter setting forth the terms which, in the Commission's [Administrator's] judgment, should govern the relations between the United States and" the person entitled to possession of the requisitioned vessel. 46 U.S.C.A. § 1242 (c).

No charter was delivered at or about the time of the requisition or, as we shall see, until long thereafter and subsequent to the sinking of the vessel.

The first step taken by respondent was on October 29th, 1942, while the Dona Aurora was still sailing the seas, when it issued an insurance binder, described as R.C. No. 944, containing the legend, "War Risks Binder Covering Vessels Requisitioned by the War Shipping Administration, Division of Wartime Insurance, Washington, D. C." Also appearing thereon is the notation, "Cancels and supersedes Binder T.C. 1142"—that issued on March 30th, 1942.

The Binder of October 29th, 1942, recites that the War Shipping Administration "insures against War Risks * * * listed in schedule below: As required by Article 20 of the Charter Party." The duration of the binder is stated as:

"From   Time of delivery to War Shipping
             Administration about April 1, 1942
"To       Termination of charter"
and the value and amount for hull coverage are listed, "As per charter."

It also contained two attachments; and endorsement No. 1 thereof, likewise dated October 29th, 1942, warranted that:

"2. This insurance shall be subject to all the rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration in force at the time of issuance of the binder and shall be subject to the terms of the requisition charter party relative to the vessel accepted by the assured and any modifications or amendments thereto.

"It is understood that all other terms and conditions of this binder remain unchanged."

The Dona Aurora was sunk by an enemy submarine on December 25th, 1942. On January 4th, 1943, the War Shipping Administration gave libellant preliminary notice of the loss and thereafter on September 15th, 1943, served conclusive notice of its actual total loss.

It was not until March 18th, 1943, that the requisition time charter was delivered to libellant and subsequently under date of June 2nd, 1944, addendum No. 1 thereto was executed and delivered. Both the requisition time charter and the addendum were made effective "as of April 1st, 1942," the date of the original delivery of the vessel to respondent. The addendum sets forth in haec verba the Option II war risk insurance valuation provision as contained in the Federal Register form of May 16th, 1942.[4]

The binder of October 29th, 1942, although issued by respondent on that day, was not delivered to, or received by, libellant until April 12th, 1943—some three months after the loss had occurred.

Following the sinking of the vessel, libellant's efforts, extending over a period of almost two years to secure a satisfactory adjustment of its claim for the loss of the Dona Aurora were fruitless. This libel was filed just three days short of the two-

3. The Dona Aurora was built and delivered in 1939. Option I did not apply to vessels constructed pursuant to construction contracts entered into subsequent to January 1st, 1935. It contained a

provision, "That if said General Order No. 9 does not set forth a formula for ascertaining such valuation, then Option II below shall apply; * * *.

4. 7 F.R., p. 3674, Part 1.E.

year limitation period in the Suits in Admiralty Act.

The principal and preliminary question is one of jurisdiction.[5]

The action was commenced pursuant to § 1128d of Title 46, which provides: "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance under * * * this title, an action * * * may be brought * * against the United States in the district court * * *. Said suits shall proceed and shall be heard and determined according to the provisions of sections 741–752 of this title [Suits in Admiralty Act] insofar as such provisions are not inapplicable and are not contrary to or inconsistent with the provisions of sections 1128–1128h of this title."[6] 46 U.S.C.A. § 1128d.

This provision, part of the amendment to the Merchant Marine Act of 1936, was designed to confer jurisdiction upon District Courts to hear claims arising out of the conduct of the Government's insurance business, authorized by that amendment. United States Lines Co. v. United States, D.C., 52 F.Supp. 758; Standard Oil Company of New Jersey v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519. The section was repealed on July 25th, 1947, during the pendency of this action.[7] Concededly, the repealer did not contain a saving clause preserving actions previously instituted.

Respondent's position is that the repeal of § 1128d, almost three years after the commencement of this suit and during its pendency, immediately divested this Court of jurisdiction and that libellant is relegated to the Court of Claims for enforcement of a claim for just compensation under 28 U.S.C.A. § 1491, formerly 28 U.S.C.A. § 250. It relies in the main upon Kline v. Burke Construction Company, 260 U.S. 226, 43 S.Ct. 79, 83, 67 L.Ed. 226, that

jurisdiction having been conferred by Congress, may at its will be "taken away in whole or in part; and if withdrawn without a saving clause all pending cases though cognizable when commenced must fall." However, the answer to the attack on jurisdiction is found in a statute intended to meet the very situation which here exists and which must be read together with the repealing statute, 1 U.S.C.A. § 109, formerly 1 U.S.C.A. § 29, which provides:

"Repeal of statutes as affecting existing liabilities.

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. July 30, 1947, c. 388, § 1, 61 Stat. 633."

This provision is to be incorporated in and construed as part of subsequent repealing statutes unless a contrary Congressional intent, either by express declaration or necessary implication, is clear. Great Northern Railway Company v. United States, 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567. The repealing statute of July 25th, 1947 contains no express language extinguishing liability previously incurred under the acts so repealed or any evidence

5. A defense by the respondent that this Court was without jurisdiction as it did not involve a war risk insurance claim but was a just compensation claim under Section 902 of the Merchant Marine Act and hence only the Court of Claims had jurisdiction, has been abandoned. (R.M. 77.)

6. June 29th, 1940, 54 Stat. 689–691, ch. 447, "secs. 221–228".

7. 61 Stat. 449. Senate Joint Resolution 123, Public Law 239, entitled, "Joint Resolution to terminate certain emergency and war powers."

of such Congressional intent. On the contrary, the Congressional purpose was directed toward the termination of the war and emergency powers contained in more than sixty statutes, most of them temporary and enacted since the beginning of World War II and no longer considered essential to the war effort.[8]

The precise issue involving both the statute and repealer relied upon by respondent, has already been determined adversely to the respondent's contention by the Ninth Circuit in United States v. McNair, 180 F. 2d 273. The Court raised the issue sua sponte after it discovered, following the submission of the appeal, that § 1128d had been repealed by the Joint Resolution of July 25th, 1947, and held, 180 F.2d at page 274: "We are of the opinion that the liability hereafter stated having been incurred by the United States prior to the repeal of the Act of June 29, 1940,[9] the right of recovery therefor continued to exist under 1 U.S.C.A. § 29, R.S. § 13, * * *."

The respondent stresses both Kline v. Burke Construction Company, supra, and Hallowell v. Commons, 239 U.S. 506, 36 S. Ct. 202, 60 L.Ed. 409. Neither is apposite to the situation at bar.

In the Kline case the Supreme Court held that a Federal Court may not enjoin parties in an action in personam from proceeding with a State Court action also in personam and involving the same subject matter. The Court held that the right to maintain an action in the Federal Courts on the ground of diversity is not one granted by the Constitution—that with the exception of the Supreme Court, whose jurisdiction is derived directly from the Constitution, every other Court derives its jurisdiction wholly from Congress. The Court stated by way of dictum the common law rule that jurisdiction having been conferred by Congress may be withdrawn by it "and if withdrawn without a saving clause all pending cases though cognizable when commenced must fall [260 U.S. 226, 43 S.Ct. 83.]" The Court there did not consider, or was there

occasion under the facts of the case, to consider, Title 1 U.S.C.A. § 109.

Hallowell v. Commons, supra, concerned the administration and the affairs of Indian tribes. The suit sought to establish title to an allotment of a deceased member of the Omaha Tribe. At one time determination of this question had been vested exclusively in the Secretary of the Interior but had been withdrawn by statute and jurisdiction transferred to the Courts. During the pendency of the action Congress enacted a law whereby jurisdiction was withdrawn from the Courts. The Act also restored to the Secretary of the Interior powers which had previously been taken from him, which included final and conclusive power to decide questions such as that at issue in the case. The Supreme Court held that the purpose of the repeal statute to revest exclusive jurisdiction in the Secretary of the Interior was abundantly clear, 239 U.S. at page 508, 36 S.Ct. at page 203. "It made his jurisdiction exclusive in terms, it made no exception for pending litigation, but purported to be universal, and so to take away the jurisdiction that for a time had been conferred upon the courts of the United States." Moreover, it was held that no substantive right was taken away by the Act but simply changed the tribunal to hear the case.

The Government also emphasizes that libellant's filing of a petition for just compensation in the Court of Claims is recognition by it of the divestiture of jurisdiction. However, the petition was filed in that Court on December 6th, 1948, shortly before the expiration of the six-year statute of limitations there applicable, undoubtedly, as a precautionary measure should respondent succeed in the instant suit. In any event, such excess of caution cannot be determinative of the jurisdictional point.

The attack on jurisdiction cannot be sustained. The liability having been incurred by respondent prior to repeal and in the absence of express language in the repeal statute, evidencing a purpose to ex-

---

8. Senate Report 339–80th Congress. First Session; House Report 799–80th Congress. First Session.

9. 46 U.S.C.A. § 1128d.

tinguish liability, the action is maintainable under § 1128d of Title 46.

The other points raised by respondent with respect to alleged lack of jurisdiction under the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, and the Public Vessels Act, 46 U.S.C.A. §§ 781–790, do not require discussion since § 1128d of Title 46 provides that actions brought thereunder are to be determined according to the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, insofar "as such provisions are not inapplicable and are not contrary to or inconsistent with the provisions of sections 1128–1128h * * *."

The Government next contends that the delivery of the war risk insurance binder by the War Shipping Administration after the known loss of the vessel was ultra vires and void. This precise defense has been determined adversely to its position in United States v. Leahy, 3 Cir., 148 F.2d 462, sub nom affirming National Bulk Carriers, Inc. v. United States, 56 F.Supp. 765, which held at page 769: "That the binder was issued after the loss occurred is immaterial. Clearly at the time the insurance binder was issued all parties knew the vessel was a total loss as a result of disaster at sea." However, it is claimed that the facts in this case are distinguishable since in that case there was but a single binder which was delivered to libellant after the loss.

The substance of its argument here is that the binder issued March 30th, 1942, in connection with the time charter of April 24th, 1942, was valid and in effect on the day of the loss—that it limited liability to $1,500,-000 and, therefore, the delivery on April 12th, 1943 of the binder issued on October 29th, 1942, fixing the amount of insurance at "as per charter," which measured war risk valuation by just compensation under Option II, was beyond the authority of any Governmental agency. The respondent poses the question to be determined thus: "Whether the insurance binder in effect on December 25th, 1942, the date of the loss of the Dona Aurora, was the binder dated March 30th, 1942, * * * or the binder dated October 29th, 1942, * * *." [10]

The determination of this issue must take into account the attendant circumstances under which the Dona Aurora was pressed into service. The chronology shows that the binder of March 30th, 1942, which fixed a war risk valuation of $1,500,000 was issued by respondent after notice to libellant of its purpose to charter the Dona Aurora on a time charter basis. This binder was not delivered to respondent until May 9th, 1942. So, too, the time charter was not delivered by the Government when it received the vessel on April 1st, 1942. It was not delivered to libellant until April 24th, 1942, but is dated "as of March 27th, 1942" and gives either party "the option of cancelling this charter at the termination of any voyage."

On May 20th, 1942, the War Shipping Administration requisitioned the vessel for use under time form charter "as of date of termination of [its] present voyage." Here, respondent was clearly exercising the option of cancelling the April 24th, 1942 charter "at the termination of any voyage."

The Government concedes the cancellation of the time charter but urges that the binder of March 30th, 1942, was not effected thereby—that the binder was an independent undertaking which continued in full force and effect until either cancelled or the obligation to make payment came into being.

Its position cannot be upheld for it disregards the terms of the binder, which provides insurance on the vessel "from the time of delivery * * * to termination of charter or until ————, whichever may first occur." Thus, when the requisition telegram of May 20th, 1942 terminated the time charter, the binder of March 30th, 1942 was terminated by its very terms.

The rate and insurance obligations of the War Shipping Administration were fixed thereafter under the applicable provisions of the standard requisition time char-

10. Parenthetically, it is observed that this contention urging the validity of the binder of $1,500,000 on December 25th, 1942, is contradictory of one of the orig- inal defenses that this is not an action upon a war risk insurance claim. (Note 8 ante.)

ter, referred to in the telegram of May 20th, 1942.

The purpose of the respondent to void the binder issued in connection with the cancelled time charter is demonstrated even more pointedly by its actions subsequent to the telegram of May 20th, 1942, which stated: "Requisition charter in form set forth in Federal Register of May 16, 1942, together with rates and insurance valuations published Federal Register May 16, 1942, will be tendered to you as soon as possible." Indeed, this was but a recognition of its statutory duty under 46 U.S.C.A. § 1242(c).

It was not until October 29th, 1942, that the War Shipping Administration took the first step to carry out its obligation when it issued the binder now sought to be repudiated. Across the face of the binder we find this unequivocal language: "R.C. 944—Cancels and supersedes Binder T.C. 1142" (that of March 30th, 1942).[11] It then recites: "The War Shipping Administration hereby insures against War Risks Only the risks as listed in schedule below: As required by Article 20 of the Charter Party." The value and amount of coverage is stated "as per charter." This is clear confirmation by respondent of its obligation to provide and pay for war risk insurance as defined in Article 20 of the standard form charter under which, as we have seen, the only valuation available was Option II.[12] A rider attached to the policy further evidences its validity and effectiveness: "This insurance * * * shall be subject to the terms of the requisition charter party relative to this vessel accepted by the assured * * *."

Equally compelling is another binder prepared by the respondent on the same day, but never delivered, or intended for delivery, to libellant and retained as an inter-office memo for the purpose of computing its premium payments into a re-volving fund for the insurance coverage of the vessel for the period from April 1st, 1942 to September 30th, 1942.[13] Here, the value and amount of insurance is defined even more precisely. It is stated as "Just Compensation Option II."

The recognition by the War Shipping Administration in the binder of October 29th, 1942, that its insurance obligations were governed by Article 20, Part II of the charter party form, published in the Federal Register of May 16th, 1942, the fact that the binder pursuant to that obligation defined "value" and "amount" "as per charter," which provided for "full compensation under Option II," the express reference to Option II in the inter-office binder, leave no reasonable room for doubt that the words "Cancels and supersedes Binder T. C. 1142" mean what they say and say what they mean. Certainly, if the binder of March 30th, 1942 had not been cancelled when the time charter was terminated, it was effectively cancelled by the binder of October 29th, 1942.

The Government further seeks to destroy the effect of the binder of October 29th, 1942, by urging that the requisition time charter itself was not in existence at that time. It asks, "How could there be a binder in effect on either October 29th, 1942 or December 25th, 1942 fixing the amount of insurance at 'as per charter' * * * if there was no charter in existence on either of those dates?" True, the charter was not physically delivered until March 1943 and the addendum in June 1944, but it was in existence within the contemplation of the parties as effectively on May 20th, 1942, the date of requisition, as if it had been signed, sealed and delivered on that day or even as of April 1st, 1942, the date of delivery of the vessel. The very purpose of publication in the Federal Register appears to be incorporation by reference. Any doubt on the subject is dispelled when we

---

11. It is clear that "R.C." stands for "Requisition Charter" and "T.C." for "Time Charter."

12. Note 3 ante.

13. The Merchant Marine Act of 1936, as amended, Title 46 U.S.C.A. § 1128(b) set up a revolving fund to be known as the Marine and War-Risk Insurance Fund "to be used for carrying out the provisions of sections 1128–1128g of this title, * * *." The premium estimates appear to have been made in connection with allocations to the Fund.

consider that it was with full knowledge of the loss of the vessel that respondent delivered the time charter in March 1943 and the addendum in June 1944, and both were made effective as of April 1st, 1942, and that it also delivered on April 12th, 1943 the binder of October 29th, 1942, which insured the Dona Aurora "from time of delivery to War Shipping Administration about April 1st, 1942 to termination of charter."

The transactions between the parties, most of them unilateral on the part of the Government, were initiated some five months after Pearl Harbor. We were in the early stages of organizing our military potential and drafting the nation's resources, manpower and material alike, to wage effective war against our enemies. The pressures of the moment did not permit of the niceties of formal contract negotiation and the drafting of definitive documents. The Government in the exercise of its sovereign power requisitioned the vessels it required, leaving for the future the execution and delivery of the formal documents defining the relationship between it and those whose property had been commandeered. Action in each instance preceded document signing. Congress clearly recognized the problem for the very law which empowered the Government to requisition vessels also required the Commission [Administrator] "at the time of the taking or as soon thereafter as the exigencies of the situation may permit," to transmit to the person entitled to possession of the vessel "a charter setting forth the terms which, in the Commission's judgment, should govern the relations between the United States and such person * *." 46 U.S.C.A. § 1242(c).

During the entire period the vessel was in the service of the Government, from the date of the requisition telegram of May 20th, 1942 until she went under, the libellant as the owner was without any instrument which defined the terms of the charter or respondent's obligations, other than the telegram. It is clear beyond peradventure that only the "exigencies of the situation" account for the non-delivery of the charter specified in the telegram and the necessary insurance coverage at or about the time the vessel was requisitioned. The subsequent issuance of the binder and of its later delivery and that of the charter to libellant merely formalized the prior understanding of the parties and carried out what should have, and under normal conditions would have, been done in the first instance.

On this very issue the Court of Appeals in United States v. Leahy, supra, held: "The obligation to furnish both [charter and insurance binder] to the owner in accordance with the statute arose at the time of the requisition * * *. The issuing of the papers only confirmed the transaction de facto concluded by the use of the ship in the service of the United States." 148 F.2d page 466.

The parties had a right to formalize their agreement as of its original date by documents thereafter delivered. This is not unusual in business transactions where there is compelling necessity for the consummation of an agreed transaction in advance of the execution of definitive documents. Not all transactions lend themselves to leisurely and formal document drafting prior to or simultaneous with performance.

■ Insofar as the insurance aspect of the transaction was concerned, the Government was engaged in business and its actions and obligations are judged by normal business standards. "* * * great business houses are held to [no] less responsibility than small ones. The United States does business on business terms." United States v. National Exchange Bank of Baltimore, 270 U.S. 527, 46 S.Ct. 388, 389, 70 L.Ed. 717; Standard Oil Company of New Jersey v. United States, supra.

■ The Court finds that the binder of October 29th, 1942 was validly issued and delivered and that it was in effect on December 25th, 1942. Any other conclusion would do violence to the facts and disregard the realistic position of the parties at the time of and under the circumstances surrounding and subsequent to the requisition of the vessel.

The respondent next contends that the action was prematurely brought in that a condition precedent to its maintenance was a determination of just compensation by the War Shipping Administration or the Maritime Commission, which assumed the former's functions after October 1st, 1946. No such determination having been made by either agency, it urges dismissal on that ground. Respondent points to the addendum to the charter of June 2nd, 1944, which expressly provides in the event of loss, war risk insurance valuation under "Option II. Just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended * * *." Title 46 U.S.C.A. § 1242. It relies upon subsection (d) of the statute, which provides: "In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is unsatisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just compensation therefor, in the manner provided for by sections 41(20) and 250 of Title 28."

■ This action is not based upon the foregoing section but is brought pursuant to § 1128d of the same title, by reason of a "disagreement as to a claim for losses * * * on account of insurance" and there is no requirement therein for any administrative determination as to just compensation. The fact that the standard of valuation or the measure of damages in the event of loss is stated as just compensation, to be determined in accordance with § 1242, does not convert the action from one grounded upon a "disagreement as to a claim for losses * * * on account of insurance" into a proceeding to be governed by the statute and rules applicable to just compensation claims. What is required is a disagreement on account of insurance. That such disagreement existed in the instant case is not open to question.

The libellant tried unsuccessfully over an extended period to obtain payment of its claim. It intensified its efforts toward the end of the two-year limitation period, only to be advised on December 11th, 1944, just two weeks before the effective date of the statute of limitations, that the War Shipping Administration had not completed its study and "that it will be impossible to settle this case before the end of the year."

■ The War Shipping Administration's failure to adjust the matter and its statement that it would be impossible to dispose of it by the time the statute of limitations would have afforded it a complete defense, constituted a disagreement as to an insurance claim sufficient to authorize the libellant to proceed under § 1128d. The existence of a disagreement is also evidenced by the testimony of the General Manager of libellant.

■ Even assuming a determination of just compensation was, in fact, required, the failure or refusal of the administrative agency to act within a reasonable time after the known loss of the vessel constituted a determination that no amount was payable or an election waiving its right to make one. It was under a duty, where action was required, to act promptly and within a reasonable period of time and when it failed or refused to do so this was equivalent to a determination that either no amount was due or in any event one that was "unsatisfactory to the person entitled thereto." 46 U.S.C.A. § 1242(d).

■ Libellant was not required to stand by and see its rights defeated by inaction on the part of the War Shipping Administration, nor was it required, as respondent suggests, to bring a mandamus proceeding to compel it to make a determination of just compensation if, in fact, this was required.

To uphold respondent's position is equivalent to saying that by its own refusal or neglect to perform its duty it may defeat the rights of persons entitled to payment of claims.

This defense is likewise overruled.

The libellant is entitled to a final decree in the sum of $2,082,000, less deductions for

payments on account and with interest in accordance with the order of this Court entered on August 4th, 1950, all as set forth in the Findings of Fact and Conclusions of Law filed herewith.